MEDINA & MEDINA, demandante, *v.* Country Pride Foods, Ltd., demandada.

*Número:* CE-87-447      *Resuelto:* 30 de junio de 1988

174

*Luis E. Dubón, Jr.*, de *Dubón & Dubón*, abogado del demandante; *Mario Arroyo Dávila* y *Salvador Antonetti*, de *Fiddler, González & Rodríguez*, abogados de la demandada.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

La Corte de Apelaciones de Estados Unidos para el Primer Circuito (Corte de Apelaciones) nos ha sometido una cuestión de gran interés relacionada con la Ley Núm. 75 de 24 de junio de 1964, según enmendada, 10 L.P.R.A. sec. 278 *et seq.*, o Ley sobre Contratos de Distribución. Por mostrarse el presente caso particularmente favorable para abordar la cuestión certificada, pasamos a exponer los hechos que la delimitan.

## I

El demandante Medina & Medina (Medina) es una sociedad mercantil colectiva organizada bajo las leyes de Puerto Rico en 1969, que distribuye productos de carne y aves. El demandado Country Pride Foods, Ltd. (Country Pride) vende productos avícolas como corporación organizada bajo las leyes del Reino Unido, con oficinas en Arkansas. En 1977, Country Pride nombró a Medina como agente y distribuidor exclusivo de todos sus productos en Puerto Rico. El contrato no especificaba el término de duración. Los precios de los productos se fijaban periódicamente por mutuo acuerdo y fluctuaban según los cambios registrados en el mercado de Georgia, una guía reconocida en la industria.

Según las determinaciones de hecho de la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico, en marzo de 1978, Country Pride exigió precios más altos por sus productos. En mayo de 1978, Medina aceptó un aumento en los precios. Un mes después, Country Pride pidió un aumento adicional. En octubre, mientras se negociaba este aumento, Country Pride propuso un cambio en la rígida estructura de fijación de precios a una de mercado libre. En noviembre, Country Pride cambió su propuesta original a una fórmula de precios más altos que los existentes, a comenzar el 1ro de diciembre por un período de prueba de 90 días. Medina rechazó esta fórmula y contrapuso una con precios más bajos. Country Pride accedió a utilizar la fórmula

de Medina por un período de 90 días, pero todas las entregas serían "C.I.F. San Juan" (*cost, insurance and freight*), con pago mediante "letra a la vista contra conocimiento de embarque". Medina informó que la condición de pago mediante letra a la vista era inaceptable.

El 27 de noviembre, Country Pride expuso nuevamente su posición: (*a*) los precios de Medina y las condiciones de pago de Country Pride o (*b*) una fórmula de precios abierta. Medina volvió a rechazar los términos de pago y alegó que había tenido problemas de escasez y excesos en los embarques, y que había recibido embarques con productos expirados. Medina contrapuso una letra a la vista pagadera 15 días después de recibir el producto. Las negociaciones continuaron, pero para el 30 de noviembre era evidente que se había llegado a un tranque. El 4 de diciembre Country Pride notificó a Medina que había enviado un embarque de productos que debía pagarse mediante letra a la vista contra conocimiento de embarque. Posteriormente, Medina hizo otra propuesta en torno a los términos de pago, a saber, el pago 7 días después de recibir el producto. Country Pride rechazó esta propuesta y reiteró su posición: "1) nuestro precio, sus términos de crédito, 2) su precio y nuestros términos de crédito." (Traducción nuestra.) Apelación del Primer Circuito, 1ro de julio de 1987, pág. 4.

Al no poder llegar a un acuerdo, el 7 de diciembre Country Pride anunció que se retiraba del mercado puertorriqueño, lo cual fue aceptado por Medina. Country Pride exigió el pago por el último embarque, pero Medina expresó que dicho pago se haría según los términos prevalecientes antes de noviembre. Country Pride exigió una transferencia de fondos contra la factura comercial a ser enviada por télex. Medina contestó que el título sobre los productos enviados pasó, a la entrega, al porteador en el puerto de embarque y que Country Pride no tenía derecho a condicionar la entrega al pago de la mercancía. Country Pride rechazó la reclama-

ción de Medina el 12 de diciembre y también le notificó que el contrato de distribución había terminado.

Posteriormente, Medina instó demanda bajo la Ley sobre Contratos de Distribución de Puerto Rico en la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico, en la que reclamó que Country Pride había dado por terminado unilateralmente su acuerdo de distribución sin justa causa. La demandada presentó moción de sentencia sumaria donde aduce, *inter alia,* que la Ley Núm. 75, *supra,* no debe interpretarse de modo que el principal tenga que pagar una cuantiosa compensación en daños cuando decide retirarse totalmente del mercado puertorriqueño, sin aprovecharse de la clientela desarrollada por el distribuidor. La Corte de Distrito, al adoptar una interpretación literal del término de justa causa, denegó la moción de sentencia sumaria. Después de celebrado el juicio, dicho foro declaró con lugar la demanda. Country Pride apeló y, oportunamente, la Corte de Apelaciones nos certificó la siguiente interrogante a tenor con la Regla 53.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y la Regla 27 del Reglamento de este Tribunal, 4 L.P.R.A. Ap. I-A; *Pan Ame. Comp. Corp. v. Data Gen. Corp.,* 112 D.P.R. 780 (1982):

> "Donde hay un contrato de plazo indefinido, con precios y términos de crédito que se han dejado abiertos a negociación, y las partes negocian de buena fe pero no pueden llegar a un acuerdo respecto al precio y crédito[,] ¿[p]roh[í]be la Ley 75 que el principal unilateralmente y totalmente se retire del mercado, cuando ese principal no hace intento alguno de apropiarse de la plusvalía o la clientela establecida?' (Traducción nuestra[.])" Alegato de la parte demandada, pág. 1.

Luego de los trámites de rigor, el 3 de septiembre de 1987 quedó sometido el caso.

## II

Estamos ante una materia de interpretación del Derecho puertorriqueño que puede determinar o definir el resultado

del caso y la Corte de Apelaciones nos ha preparado una excelente relación de todos los hechos relevantes, según adjudicados y depurados por el foro federal de origen.

■ En *Pan Ame. Comp. Corp. v. Data Gen. Corp.*, supra, págs. 784–785, expusimos en sus aspectos esenciales las raíces históricas y reglamentarias que informan el procedimiento de certificación interjurisdiccional en Puerto Rico. Reconocimos que "[l]a certificación es el medio más directo, rápido y económico para que la Corte federal obtenga una interpretación autorizada sobre el derecho estatal". Hoy reafirmamos estas expresiones.

■ El procedimiento provisto por la Regla 53.1 de Procedimiento Civil, *supra*, y la Regla 27 de nuestro Reglamento, *supra*, ha dado lugar a una útil colaboración entre las dos jurisdicciones. Varios son los factores que han precipitado estos desarrollos. Por un lado, son producto de cambios en los propios enfoques adjudicativos de este Tribunal Supremo. Hemos venido a reconocer la primacía de las normas de derecho civil en la resolución de controversias de derecho privado. No siempre fue así. *Valle v. Amer. Inter. Ins. Co.*, 108 D.P.R. 692 (1979). Como resultado, los foros federales —particularmente los foros apelativos— se han mostrado más sensibles, respetuosos y prudentes en la interpretación y adjudicación del Derecho puertorriqueño. Véanse: S. Breyer, *The Relationship between the Federal Courts and the Puerto Rico Legal System*, LIII Rev. Jur. U.P.R. 307 (1984); *Reyes-Cardona v. J.C. Penney Co., Inc.*, 694 F.2d 894, 896–897 (1er Cir. 1982); M. Arroyo-Dávila, *Federal Court Certification Revisited*, 45 Rev. C. Abo. P.R. 58 (1984).

■ La certificación constituye un valioso instrumento para que el foro federal nos pregunte directamente nuestra interpretación del Derecho puertorriqueño cuando aquí no existan precedentes claros que dispongan de la controversia

pendiente en esa jurisdicción. Conscientes ambos foros de las peculiaridades históricas y jurídicas que nos distinguen, así como de los lazos que también en lo histórico y jurídico nos unen, este procedimiento se ofrece, especialmente en nuestro caso, como un mecanismo adecuado para aliviar y reducir las tensiones que surgen entre los tribunales federales y los puertorriqueños. *Pan Ame. Comp. Corp. v. Data Gen. Corp.*, supra, pág. 785; *Lehman Brothers v. Schein*, 416 U.S. 386, 391 (1974); Nota, *Interjurisdictional Certification: Beyond Abstention Toward Cooperative Judicial Federation*, 111 U. Pa. L. Rev. 344 (1963).

Aclarado el marco adjudicativo, oportunamente respondemos a la interrogante certificada.

## III

En el pasado, ante distintas controversias sobre la Ley Núm. 75, *supra*, hemos examinado extensamente los antecedentes de su formación y precisado los fines que determinaron su nacimiento en nuestro Derecho. Casi invariablemente hemos hecho referencia al siguiente pasaje de su exposición de motivos:

> El Estado Libre Asociado de Puerto Rico no puede permanecer indiferente al creciente número de casos en que empresas domésticas y del exterior, sin causa justificada, eliminan sus distribuidores, concesionarios, o agentes, tan pronto como éstos han creado un mercado favorable y sin tener en cuenta sus intereses legítimos.
>
> La Asamblea Legislativa de Puerto Rico declara que la razonable estabilidad en las relaciones de distribución en Puerto Rico es vital a la economía general del país, al interés público y al bienestar general, y en el ejercicio del poder policial, considera necesario reglamentar, en lo pertinente, el campo de dichas relaciones, para evitar los abusos que ciertas prácticas ocasionan. 18 Diario de Sesiones de la Asamblea Legislativa (Senado), Parte III, pág. 1531 (1964).

También hemos citado de los informes legislativos que precedieron a su aprobación:

Recientemente se ha recrudecido el problema creado en el sistema de distribución en Puerto Rico por la acción intempestiva de empresas manufactureras domésticas y del exterior que, sin causa justificada, dan por terminadas sus relaciones con sus distribuidores y agentes en Puerto Rico, tan pronto como éstos han creado un mercado favorable para sus productos, frustrando las legítimas expectativas e intereses de los que tan eficientemente han cumplido con sus responsabilidades.

. . . . . . . . .

Las disposiciones tradicionales que regulan los contratos entre particulares han demostrado no ser eficaces para proteger los legítimos derechos del distribuidor o agente, por lo que se hace necesario legislar para reglamentar esta relación y garantizar que los manufactureros actúen de buena fe, equitativamente, de manera no arbitraria, y preservar al distribuidor o agente los derechos y las expectativas justificadas inherentes a la relación. Además, esto tendrá la consecuencia de dar estabilidad a las relaciones de distribución.

Esta es la grave situación que se intenta remediar con la aprobación de este proyecto. . . . Diario de Sesiones, *supra.*

Véanse: *Roberco, Inc. y Colón v. Oxford Inds., Inc.,* 122 D.P.R. 117 (1988); *Marina Ind., Inc. v. Brown Boveri Corp.,* 114 D.P.R. 64 (1983).

■ A la luz de estos propósitos, consistentemente hemos resuelto que "[l]a Ley Núm. 75 representa incuestionablemente una fuerte política pública encaminada a nivelar las condiciones de contratación de dos grupos económicamente dispares en su fuerza". *Walborg Corp. v. Tribunal Superior,* 104 D.P.R. 184, 189 (1975). A fin de lograr una razonable estabilidad en las relaciones de distribución en Puerto Rico, renglón importante de nuestra economía insular, pretendió el legislador nivelar en lo posible el poder de negociación entre el fabricante y el distribuidor. *Marina*

*Ind., Inc. v. Brown Boveri Corp.*, supra, pág. 85; *San Juan Merc. v. Canadian Transport Co.*, 108 D.P.R. 211, 216 (1978). Véase, también, G.B. Serota, *Constitutional Obstacles to State "Good Cause" Restrictions on Franchise Terminations*, 74 Colum. L. Rev. 1487 (1974).

En su estructura básica, la Ley Núm. 75, *supra*, está considerada como "prototipo" entre aquellas que en las últimas décadas han reglamentado en el mundo entero las relaciones entre manufactureros y distribuidores. Véase A.M. Saltoun y B.C. Spudis, *International Distribution and Sales Agency Agreements: Practical Guidelines for U.S. Exporters*, 38 Bus. Law. 883, 885 (1983).[1] La actividad previsora del legislador, sin embargo, nunca es absoluta. Como bien se ha señalado, "a poco que se dieron los primeros pasos para poner en vigor la Ley 75 mediante recursos judiciales, se observó que la misma adolecía de ciertas deficiencias que tendrían que ser corregidas. . .". *Estudio sobre la Ley 75 de 24 de junio de 1964 que reglamenta los contratos de distribución*, San Juan, Cámara de Comercio de Puerto Rico, 1976, pág. 14. Sobre la marcha, la Legislatura tuvo que enmendar la Ley Núm. 75, *supra*, para atemperarla a las realidades y necesidades de este régimen especial de comercialización, y así superar ciertos inconvenientes que presentaba su texto original. Íd. De igual forma, ante el silencio del legislador en otros aspectos sensitivos del es-

---

[1] Véanse, también: C.J. Faruki, *The Defense of Terminated Dealer Litigation: A Survey of Legal and Strategic Considerations*, 46 (Núm. 4) Ohio St. L.J. 925 (1985); J.S. Finkelstein, *Legislative and Judicial Regulation of Exclusive Distribution Agreements in France*, 15 Int'l Law. 539 (1981); S. Antonetti, *Puerto Rico's Dealer's Act Fourteen Years Later*, 83 Com. L.J. 453 (1978); Meyer, *Terminating Sales Arrangements in West Germany*, 7 Tex. Int'l L.J. 233 (1972); T.W. Simons, *Termination of Sales Agents and Distributors in Belgium*, 17 Int'l Law. 752 (1983); R.B. Cartwright, *The New Saudi Commercial Agencies Regulation*, 16 Int'l Law. 443 (1982).

quema, en ocasiones este Tribunal ha tenido que impartir contenido al estatuto.

◼ Así, por ejemplo, en *J. Soler Motors v. Kaiser Jeep Int'l*, 108 D.P.R. 134 (1978), interpretamos que la Ley Núm. 75, *supra*, no requiere exclusividad en la distribución de un producto o prestación de un servicio, por lo que dicha ley no impide cambios de intermediarios. También en *San Juan Merc. v. Canadian Transport Co.*, supra, decidimos que la Ley Núm. 75, *supra*, no aplicaba a todo agente. En *Marina Ind., Inc. v. Brown Boveri Corp.*, supra, resolvimos que la fórmula de daños del estatuto no es mecánica, y recientemente, en *Pacheco v. Nat'l Western Life Ins. Co.*, 122 D.P.R. 55 (1988), adjudicamos que las lagunas de la Ley Núm. 75, *supra*, sobre la interrupción del término prescriptivo debían ser subsanadas por el Código de Comercio y no por el Código Civil.

◼ La presente controversia suscita la interrogante siguiente: ¿fue la intención del legislador que la Ley Núm. 75, *supra*, aplicara al tipo de situación en la que el principal de buena fe decide retirarse totalmente del mercado puertorriqueño? En la alternativa, ¿constituye "justa causa", para la terminación de la relación el retiro del mercado de buena fe?

◼ En principio, la Ley Núm. 75, *supra*, no provee este aspecto de la relación entre el principal y el distribuidor.[2] P. Salamone, *Puerto Rico's Distributor's Law: Law*

---

(2) En *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 86 (1983), la recurrente Brown Boveri planteó la invalidez constitucional de la Ley Núm. 75 de 24 de junio de 1964, según enmendada, 10 L.P.R.A. sec. 278 *et seq.*, por ésta no admitir otros motivos para la terminación del contrato como: "a) la buena fe del principal, b) su derecho a establecer su propio sistema de distribución, c) hacer ajustes al sistema de distribución que de buena fe considere necesarios para incrementar su mercado, y d) *su decisión de retirarse, por completo del territorio donde ha operado.*" (Énfasis suplido.) No obstante, este Foro no pudo entrar a

*75: A Primer*, 18 Rev. Jur. U.I.A. 67, 70 esc. 10 (1983). La definición de justa causa del estatuto se refiere sólo a los actos que son imputables al distribuidor.[3] Las vicisitudes y circunstancias del principal no juegan ningún papel en la ruptura de la relación contractual. Salvo raras excepciones, idéntica situación impera en el resto de las jurisdicciones estatales.[4]

Esta orientación legislativa recientemente ha sido objeto de crítica y discusión. A. Hurwitz, *Franchise Market Withdrawal: "Good Cause" for Termination?*, 7 Franchise L.J. 3 (Fall 1987). También, ha provocado reacciones jurisprudenciales destinadas a evitar, mediante un replanteamiento judicial del propio concepto de justa causa, las dificultades que enfrentarían estos estatutos si fueran interpretados de forma que los principales estuviesen condenados a vivir en interminable simbiosis con la empresa distribuidora bajo todo género de circunstancias. Véanse: *Remus v. Amoco Oil*

considerar tal planteamiento, pues la apelante Brown Boveri no alegó ninguno de esos motivos para la terminación del contrato, por lo que no tenía capacidad jurídica para cuestionar la validez constitucional del estatuto.

[3] El Art. 2 de la Ley Núm. 75, *supra*, dispone:

"No empece la existencia en un contrato de distribución de una cláusula reservándole[s] a las partes el derecho unilateral a poner fin a la relación existente, ningún principal o concedente podrá dar por terminada dicha relación, o directa o indirectamente realizar acto alguno en menoscabo de la relación establecida, o negarse a renovar dicho contrato a su vencimiento normal, excepto por justa causa." 10 L.P.R.A. sec. 278a.

El Art. 1(d) de la Ley Núm. 75, *supra*, define, por otra parte, el término "justa causa" de la forma siguiente:

"(d) Justa causa: incumplimiento de alguna de las obligaciones esenciales del contrato de distribución, por parte del distribuidor, o cualquier acción u omisión por parte de éste que afecte adversamente y en forma sustancial los intereses del principal o concedente en el desarrollo del mercado o distribución de la mercancía o servicios." 10 L.P.R.A. sec. 278(d).

[4] Sin embargo, véase en California el *Cal. Franchise Relations Act*, Cal. Bus. & Prof. Code sec. 20025, donde se provee como razón para la no renovación del contrato de concesión mercantil el retiro del concedente de la zona geográfica objeto de la concesión. Véase, también, bajo el *Petroleum Marketing Practices Act*, 15 U.S.C.A. sec. 2804 (West Supp. 1979), idéntica razón para la terminación de la franquicia.

*Co.*, 794 F.2d 1238 (7mo Cir. 1986); *Lee Beverage Co. v. I.S.C. Wines of California*, 623 F. Supp. 867 (Wis. 1985); *St. Joseph Equipment v. Massey-Ferguson, Inc.*, 546 F. Supp. 1245 (Wis. 1982); *Designs in Medicine, Inc. v. Xomed, Inc.*, 522 F. Supp. 1054 (Wis. 1981); *Consumer Oil Corp. of Trenton, N.J. v. Phillips Petro. Co.*, 488 F.2d 816 (3er Cir. 1973). *Cf. Kealey Pharmacy & Home Care Serv. v. Walgreen Co.*, 539 F. Supp. 1357 (Wis. 1982).

▪ Un examen de los principios que informan la figura contractual aquí presente nos permite, también en el caso de la Ley Núm. 75, *supra*, pautar fórmulas armónicas que salven cualquier defecto constitucional del estatuto.

## IV

▪ El contrato de distribución es un contrato típico de los que la doctrina llama "de duración" o "de tracto sucesivo". En gran medida, está inspirado en el principio de la confianza. Cuando un principal o concedente concluye este tipo de contrato, lo hace previendo las cualidades profesionales y económicas del concesionario, sus conocimientos del mercado, su capacidad comercial y su crédito. Se trata de un pacto *intuitu personae*. Véanse, también: *J. Soler Motors v. Kaiser Jeep Int'l*, supra; J. Garrigues, *Tratado de Derecho Mercantil*, Madrid, Ed. Rev. Der. Mercantil, 1963, T. III, Vol. 1, pág. 536; J.R. Cano Rico, *Manual Práctico de Contratación Mercantil*, Madrid, Ed. Tecnos, 1985, Vol. 1, pág. 376.

▪ Principal y distribuidor se hallan en relación de colaboración en la distribución y venta de un producto. No están vinculados por ningún pacto ni relación de dependencia que subordine una empresa a la otra. E.A. Braun, *Policy Issues of Franchising*, 14 Sw. U.L. Rev. 156, 221 (1984). Cada empresario explota su propia empresa en su nombre, asume sus propios riesgos y busca su propio lucro. Véanse, también:

T. Puente Muñoz, *El contrato de concesión mercantil*, Madrid, Ed. Montecorvo, 1976, pág. 25; R. Uría, *Derecho Mercantil*, Madrid, Ed. Montecorvo, 1976, pág. 543.

Aún más, desde el punto de vista económico, las empresas concedentes y concesionaria están ligadas por el éxito o fracaso de la comercialización del producto. La doctrina ha señalado con acierto que la relación de distribución se asemeja a la relación de sociedad; "asociación para vender". Puente Muñoz, *op. cit.*, pág. 40. Ésta no se agota con una única compraventa, sino que a lo largo de la misma se concluirán tantos contratos de compraventa como sean necesarios para satisfacer las necesidades de reventa del distribuidor o concesionairo.

Para el principal, la relación de distribución no es sino un medio de planificación de la venta de sus mercancías. En algunos casos, se compromete a no vender productos semejantes a los que son objeto de la concesión a ningún otro revendedor en la zona de la exclusiva de venta. La nota que define al distribuidor es, por otra parte, la de ser "un empresario mercantil independiente que ha establecido una relación de continuidad y duración, fija o indeterminada, con otro empresario principal para la distribución de un producto o servicio. Esta relación se caracteriza por la cooperación, la estabilidad y la confianza mutua que genera". (Escolio omitido.) *Roberco, Inc. y Colón v. Oxford Inds., Inc.*, supra, pág. 134. En este sentido, asume un riesgo comercial superior al que resulta de la simple cláusula de comisión.

A tenor con estos principios básicos, ya reconocidos por nuestra jurisprudencia, es fácil advertir cómo en los contratos de distribución, que normalmente son de duración muy larga, se hace absolutamente necesario que tanto principal como distribuidor puedan variar y negociar de buena fe

los precios y términos de crédito para la venta de los productos objeto de la concesión. Así ocurrió en el presente caso. Es ante la falta de entendimiento en las negociaciones que Country Pride decide retirarse del mercado puertorriqueño. Como bien expresa la Corte de Apelaciones, plantéase entonces si un principal en esta situación estaría forzado por la Ley Núm. 75, *supra*, a escoger entre una de estas dos (2) alternativas: (*a*) tener que aceptar, sin opción, los precios y términos de crédito que le imponga su distribuidor o (*b*) dar por terminado el acuerdo o contrato y sufrir de todos modos las consecuencias de tener que pagar una cuantiosa compensación.

█ Como antes expresáramos, la Ley Núm. 75, *supra*, fue diseñada para darle al distribuidor los mecanismos necesarios de suerte que, al discutir con el manufacturero un cambio en la distribución, tuviese poder de regateo. Surge, además, el propósito específico del legislador de brindar un remedio cuando el principal elimina al distribuidor sin justa causa y establece en Puerto Rico facilidades para la distribución directa de mercancías o la prestación de servicios que previamente habían estado a cargo del distribuidor, *aprovechándose de este modo del mercado (clientela) desarrollada por el primero. San Juan Merc. v. Canadian Transport Co.*, supra, págs. 215–216.

█ Nos merecen mucho respeto las declaraciones del legislador sobre los males sociales que quiso remediar. Es por ello que un examen a fondo de la Ley Núm. 75, *supra*, historial, fuentes y razones de originación nos lleva a concluir que no fue la intención legislativa convertir los contratos de distribución en relaciones interminables. En primer término, porque dicha opción legislativa tropieza con serias objeciones constitucionales. En segundo lugar, porque, como antes expresáramos, principal y distribuidor no

tienen intereses contrapuestos. Tampoco están vinculados por ningún pacto ni relación de dependencia que subordine una empresa a la otra. No es posible interpretar el estatuto de forma que el distribuidor pueda dirigir —al imponer sus condiciones— la política de venta del principal o viceversa, con la correspondiente pérdida de la autonomía económica y jurídica de ambos. Tal interpretación sería contraria al orden público en la medida que implicaría una limitación irrazonable a la libre determinación del hombre.

Ahora bien, razones de equidad exigen que el retiro venga condicionado para evitar la arbitrariedad de aquel que lo ejercita. La doctrina científica está conteste en que "[e]n cualquier caso se exige que la denuncia del contrato se haga de buena fe,(5) en tiempo oportuno, con un plazo de preaviso de acuerdo con la naturaleza de la concesión y las características de la empresa concesionaria". (Énfasis suplido.) Puente Muñoz, op. cit., pág. 173.

En cuanto al plazo de preaviso, prevéase que permita al concesionario "informarse con tiempo suficiente de las intenciones del concedente para operar un cambio de relaciones mercantiles. . .". Puente Muñoz, op. cit., pág. 175 esc. 159. Se trata, en definitiva, de que el distribuidor pueda paliar los efectos de la ruptura a tiempo y preparar su futuro como empresario. Cuando el retiro del mercado responda a una diferencia entre las partes sobre algún elemento esencial del contrato, la razonabilidad del plazo dependerá, entre otras circunstancias, del tiempo e intensidad con que las partes hayan venido negociando los términos en conflicto.

---

(5) Cuando el principal o concedente se vale de subterfugios o el fraude para enviar o permitir que se envíe por canales indirectos a Puerto Rico su mercancía, o utiliza el mecanismo del retiro de la zona geográfica como pretexto para circunvalar la acción remedial del estatuto, circunstancias que no están presentes en este caso, la doctrina reconoce a favor del distribuidor un derecho a indemnización bajo diferentes supuestos que no es necesario ahora abordar.

Los criterios seguidos por la jurisprudencia europea para determinar el plazo del preaviso son de ayuda. Dicho plazo deberá estar en función de la integración más o menos estrecha entre las empresas concedentes y concesionarias. Mientras menos líneas represente un distribuidor, mayor será su dependencia en cada línea que trabaja. Si el concesionario creó su empresa únicamente para vender las mercancías objeto de la concesión que se retira, la ruptura del contrato puede significar la desaparición de su actividad mercantil. *A contrario sensu*, la terminación de un contrato que tan sólo representa una pequeña fracción del negocio del distribuidor no le producirá graves desbalances en sus operaciones.(6) Por otro lado, se debe tener en cuenta la antigüedad de los lazos que rompe el distribuidor, las condiciones del mercado correspondiente al sector comercial en particular y las relaciones con otros proveedores y con la clientela ligada al producto que se retira. En resumen, opina la doctrina que el concedente debe observar un plazo de preaviso que un empresario, quien actúa de forma diligente y de buena fe, hubiera previsto. Puente Muñoz, *op. cit.*, pág. 174.

A la luz de lo expuesto, contestamos la interrogante certificada en los términos siguientes: la Ley Núm. 75, *supra*, no prohíbe que el principal se retire totalmente del mercado de Puerto Rico cuando ese principal no ha hecho intento de apropiarse de la plusvalía o de la clientela establecida, fruto de la actividad del distribuidor, y dicho abandono —que constituye justa causa para dar por terminada la relación— se debe a que las partes han negociado de buena fe, pero no han podido llegar a un acuerdo en cuanto al precio, crédito o

---

(6) Es el distribuidor el que conoce el mercado correspondiente a su sector y está en contacto con los minoristas y con los consumidores; en otras palabras: tiene la clientela. Nada impide que el concesionario pueda ofrecer sus servicios y su conocimiento del mercado a un nuevo concedente cuando termina su relación actual.

algún otro elemento esencial del contrato de distribución. En todo caso, dicho retiro deberá venir precedido por un plazo de preaviso que dependerá de la naturaleza de la concesión, de las características de la empresa distribuidora y de la naturaleza de los tratos que anteceden a la ruptura del contrato.

*Se dictará la sentencia de conformidad.*

El Juez Asociado Señor Ortiz contestaría la interrogante certificada en la negativa, por ser de opinión que la Ley Núm. 75, *supra*, no cubre la situación en que el principal unilateral y totalmente se retira del mercado cuando ese principal no hace intento alguno de apropiarse de la plusvalía o de la clientela establecida. Del texto y del historial legislativo de la Ley Núm. 75, *supra*, surge diáfanamente que la misma entra en juego cuando el principal da por terminado el contrato para hacer un cambio de distribución, ya sea para vender directamente o a través de agentes comisionistas, o de uno o más nuevos distribuidores. No puede ser su propósito el regir y limitar la decisión comercial de retirarse por completo del mercado puertorriqueño. En estos casos no hay razón de pedir ni remedio alguno al amparo de la Ley Núm. 75, *supra*, y por lo tanto, es innecesario e irrelevante discutir y considerar si hubo o no justa causa para la terminación del contrato. El Juez Asociado Señor Negrón García se inhibió. Los Jueces Asociados Señor Rebollo López y Señora Naveira de Rodón no intervinieron.