**TATAN MANAGEMENT,**
**et al., Plaintiffs,**

v.

**JACFRAN CORPORATION,**
**et al., Defendants.**

**No. CIV. 03–1499(PG).**

United States District Court,
D. Puerto Rico.

June 20, 2003.

Victor P. Miranda–Corrada, Nelson Robles–Diaz, San Juan, PR, for Tatan Management, Inc., a Puerto Rico Corporation, Antonio I. Ortega–Dardet, Teresa Amorin, Conjugal Partnership Ortega–Amorin, plaintiffs.

Miriam D. Salwen–Acosta, Cond. Centro I, San Juan, Craig P. Miller, William L. Killion, Gray, Plant, Mooty, Mooty & Bennett, PA, Minneapolis, MN, for Jacfran Corporation, a Delaware Corporation, Jacadi USA, Inc., a Delaware Corporation, Jacadi S.A., a corporation (societe anonime) organized under the laws of the Republic of France, Bruce Pettibone, Linda Pettibone, Conjugal Partnership Pettibone–Pettibone, defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

The parties, Tatan Management, Inc., Antonio Ortega, Teresa Amorín, and the conjugal partnership between the last two (collectively "Plaintiffs"), and Jacfran, Inc., Jacadi USA, Inc., Bruce Pettibone, and Linda Pettibone (collectively "Defendants") appeared at a hearing held before this Court on June 10 and 11, 2003. The Court having heard testimony, having received evidence submitted by the parties on the issues before it, and having heard arguments on the related legal issues, hereby **DENIES** Plaintiffs' request for a Preliminary Injunction.

## BACKGROUND

Plaintiffs Antonio Ortega and Teresa Amorín first met with Mr. Bruce Pettibone, Vice President and Chief Operating Officer of Jacfran, Inc., in early 1993 to explore the opening of a "Jacadi" franchise in Puerto Rico. Jacfran, Inc., is the owner of the "Jacadi" trademark and the grantor of franchises for the development, sale, and marketing of "Jacadi" children wear and furniture, "Veronique Delachaux" maternity wear, and other accessories. Jacadi USA is the authorized supplier of this merchandise in the United States and Puerto Rico. After successful negotiations Plaintiffs placed their first order of "Jacadi" merchandise in late 1993 and opened their "Jacadi" store in June, 1994. The parties signed a Franchise Agreement on May 31, 1994. The Agreement granted Plaintiffs a nine-year license to use and display the "Jacadi" trademarks in connection with the operation of a franchise in Puerto Rico.

As far as the record shows, the early years of the relationship between the parties were uneventful and the franchise operated successfully. Defendants claim that around 1997 Plaintiffs started running outstanding balances on the royalty fees and merchandise payments; both parties agree that the relationship started to change for the worse in 2001. In the Fall of 2001, Jacadi USA withheld the shipment of the Winter 2001 merchandise because Plaintiffs had not complied with their payment obligations. The parties eventually reached an agreement, including a payment plan, to solve the impasse and release the merchandise. Months later, in the Spring of 2002, Defendants again withheld the shipment of merchandise to the Plaintiffs. Defendants' proffered reason for the delay was Plaintiffs' refusal to pay the outstanding balances on previous shipments—balances that had been the subject of the previous payment plan. The parties again reached an agreement, including a payment plan, to solve the impasse and release the merchandise.

In the Fall of 2002 Defendants withheld Plaintiffs' shipment of merchandise for failure to abide by the terms of the payment plan. Defendants' imposed certain conditions on Plaintiffs—including prepayment and the execution of a personal guaranty for the past due amounts—before agreeing to release the merchandise, but Plaintiffs objected to some of these conditions. This time, the impasse was not resolved. On April 28, 2003, Defendants sent Plaintiffs a formal notification of default under the Franchise Agreement giving Plaintiffs thirty days to cure the default. Since, according to Defendants, Plaintiffs failed to cure the default and did not comply with the conditions for renewal, the agreement was terminated.

Plaintiffs filed suit on May 7, 2003, seeking injunctive relief under the Puerto Rico Dealers' Contracts Act. This Court denied Plaintiffs' request for an ex parte Temporary Restraining Order, and announced that a hearing was to be held once the named defendants had been served with summons. (Order, Docket No. 3). Having been informed that Jacfran, Inc. and Jacadi USA had been served, the Court scheduled a preliminary injunction hearing for June 10, 2003.

## DISCUSSION

There are four elements necessary to grant injunctive relief: 1) there must be a substantial likelihood of success on the merits; 2) the preliminary injunction must be necessary to prevent irreparable injury; 3) the threatened harm must outweigh the harm a preliminary injunction would inflict on the nonmovant; and 4) the preliminary injunction would serve the public interest. *New Comm Wireless Servs., Inc. v. Sprint-Com, Inc.*, 287 F.3d 1, 8–9 (1st Cir.2002); *Narragansett v. Guilbert*, 934 F.2d 4, 5 (1st Cir.1991) *see also* Fed.R.Civ.P. 65. Because the Plaintiffs seek injunctive relief under the Puerto Rico Dealers' Contracts Act, the Court examines the interplay between the traditional criteria for injunctive relief and the relevant provisions of the Act.

The Puerto Rico Dealers' Contracts Act, 1964 P.R. Laws 75, 10 P.R. Laws Ann. §§ 278–278d, (hereinafter "Law 75"), was enacted "to protect Puerto Rico dealers from the harm caused when a supplier arbitrarily terminates a distributorship once the dealer has created a favorable market for the supplier's products." *R.W. Int'l Corp. v. Welch Food, Inc.*, 13 F.3d 478, 482 (1st Cir.1994). The Act covers all dealers' contracts [1] involving the distribu-

---

**1.** A "dealer's contract" is defined as a "relationship established between a dealer and a

principal or grantor whereby and irrespective of the manner in which the parties may call,

tion, agency, concession or representation of merchandise in the market of Puerto Rico. *See* 10 P.R. Laws Ann. § 278. Article 2 prohibits parties from performing "any act detrimental to the established relationship or refus[ing] to renew said contract on its normal expiration, except for just cause." 10 P.R. Laws Ann. § 278a. Thus, the effect "is not only to protect local distributors from arbitrary termination, but also to bind the supplier to the dealership agreement unless it can prove 'just cause' for termination." *Sheils Title Co. v. Commonwealth Land Title Ins.*, 184 F.3d 10, 14 (1st Cir.1999). "Just cause" is defined as "nonperformance of any of the essential obligation of the dealer's contract on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interest of the principal or grantor in promoting the marketing or distribution of the merchandise or service." 10 P.R. Laws Ann. § 278(d). A supplier's failure to prove just cause for termination or refusal to renew "authorizes the court to compensate the dealer 'for the hard-earned clientele unjustly appropriated by the supplier.'" *Id.* (citing *Nike Int'l Ltd. v. Athletic Sales, Inc.*, 689 F.Supp. 1235, 1238 (D.P.R.1988)).

Article 3A of the Act allows court to grant "any provisional remedy or measure of an interdictory nature to do or desist from doing, ordering any of the parties or both, to continue, in all its terms, the relation established by the dealer's contract, and/or to abstain from performing any act or any omission in prejudice thereof." 10 P.R. Laws Ann. § 278b–1. The Act instructs courts issuing such provisional remedies to "consider the interests of all parties concerned and the purposes of the public policy contained in this chapter." *Id.; see also Systema de P.R., Inc. v. Interface Int'l*, 123 D.P.R. 379, 387 (1989) (explaining that Law 75 requires a thorough review of the evidence and a careful balancing of the interests and equities of the parties). "This provision is intended to protect the dealer from the economic losses that it may suffer once the contract has been terminated and before litigation on the matter has been resolved." *Picker Int'l v. Kodak Caribbean, Ltd.*, 826 F.Supp. 610, 613 (D.P.R.1993); *accord Systema de P.R.*, 123 D.P.R. at 386–87.

To grant a preliminary injunction under Law 75 a court must consider "(1) the public policy of the law, (2) the interests of the parties, and (3) whether the plaintiff is a dealer." [2] *Picker Int'l*, 826 F.Supp. at 613; *accord Cobos Liccia v. Dejean Packing Co.*, 124 D.P.R. 896, 903 (1989). The moving party has the burden of showing why the injunctive relief should be granted. *Picker Int'l*, 826 F.Supp. at 613. In this analysis courts are not required to apply all requirements of a traditional preliminary injunction, *Cobos Liccia*, 124 D.P.R. at 903; thus, the availability of injunctive relief under Article 3A "is not tied to a showing of irreparable injury or to probability of success in the case on the merits, but rather to the policies of the Act in promoting the continuation of dealership agreements and the strict adherence to the provisions of such agreements." *DeMoss*

characterize or execute such relationship, the former actually and effectively takes charge of the distribution of merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico." 10 P.R. Laws Ann. § 278. A dealer's contract need not grant exclusive rights or cover the entire geographic area of Puerto Rico to fall under the Act. *See Roberco, Inc. v. Oxford Indus., Inc.*, 122 D.P.R. 115, 124 (1988). The Court assumes that the case at hand falls under Law 75, since the parties have not argued otherwise.

**2.** In this case, the parties do not dispute that Plaintiffs' are a "dealer" under Law 75.

*v. Kelly Servs., Inc.*, 493 F.2d 1012, 1015 (1st Cir.1974).

This flexibility does not mean, however, that the provisional remedies of Law 75 are independent from the provisions of the Rules of Civil Procedure. *Aybar v. F. & B. Mfg. Co.*, 498 F.Supp. 1184, 1190 (D.P.R.1980). As this Court explained in *Aybar,* in providing such provisional remedies the Puerto Rico Legislature was not creating additional remedies, but merely "making use of available resources" that are subject to traditional procedural safeguards. *Id.* at 1191–92. Moreover, while under Law 75 "the district court need not automatically take 'probability of success' into account, nothing in Article 3A says it may not ever do so." *Luis Rosario, Inc. v. Amana Refrigeration, Inc.*, 733 F.2d 172, 173 (1st Cir.1984). Weighing the parties' interests and the injunction's effect on statutory policies implies an examination into the threat of irreparable harm, the existence of just cause, and the overall merits of the case. *See Picker Int'l,* 826 F.Supp. at 613; *see also Pan Am. Computer Ass'n v. Data Gen. Corp.*, 652 F.2d 215, 217 (1st Cir.1981) ("While the statute does not require a finding of likelihood of success as a prerequisite to issuance of an injunction, the court's view of the merits would certainly affect its judgment of the weight of the parties' interests and of the injunction's effect on the statutory policies."); *Systema de P.R.,* 123 D.P.R. at 387 (stating that the statute does not prohibit the use of the traditional preliminary injunction criteria, but the decision must be compatible with the spirit of Law 75).

With this criteria as the guiding light, the Court examines the evidence presented to determine if a preliminary injunction is warranted.

### Likelihood of Success—Just Cause

Defendants claim that they had just cause to terminate the agreement and in fact terminated the agreement. In the alternative, they argue that they had just cause not to renew the franchise agreement. The Court agrees with the Defendants, finding that they had just cause both the terminate the agreement and refuse to renew it.

### Termination of the Agreement

■ Defendants argue that they had just cause to terminate the agreement based on two instances of breach by the Plaintiffs. Defendants claim that Plaintiffs breached the Franchise Agreement by refusing to pay Jacfran the past due royalties, which amounted to $24,571.93. (Defs.' Ex. H). Defendants also claim that Plaintiffs breached the Franchise Agreement by refusing to pay Jacadi USA the past due balance for merchandise sold and delivered, which amounted to $192,702. (Defs.' Ex. H). Plaintiffs, on the other hand, argue that Defendants terminated the Franchise Agreement without just cause because Jacadi USA was not a party to the Agreement, the terms of payment for "Jacadi" merchandise received from Jacadi USA were not included in the Franchise Agreement, and failure to pay Jacadi USA for the inventory is not mentioned in the Franchise Agreement as a cause for default. Plaintiffs also claim, as to the payment of both royalties and merchandise, that the parties tacitly altered the terms of payment as to excuse Plaintiffs' noncompliance. The Court examines each alleged ground for termination separately.

### Payment of Merchandise to Jacadi USA

Paying for goods on time is usually considered an essential obligation of a dealer's contract. *See PPM Chem. Corp. of P.R. v. Saskatoon Chem. Ltd.*, 931 F.2d 138, 139 (1st Cir.1991); *Biomedical Instrument & Equip. Corp. v. Cordis Corp.*, 797 F.2d 16, 17 (1st Cir.1986). The parties might alter the conditions and terms of this obligation

explicitly or through their conduct, *see Biomedical Instrument,* 797 F.2d at 17, but such changes do not strip the obligation to pay of its status as an "essential obligation" in a dealers' contract. The questions that remain, thus, are whether in this particular context the terms of payment for merchandise were not "essential obligations" and whether the Plaintiffs—either because the terms of payment were per se unenforceable or the parties' tacitly altered the terms of payment—were somehow excused for their untimely and incomplete payments.

There is no reason to think that payment for the merchandise was not an essential element of the dealer's contract between Plaintiffs and Jacfran. Jacadi USA, the entity to whom Plaintiffs owed the merchandise payments, is not a party to the Franchise Agreement between Jacfran and Plaintiffs. (Franchise Agreement, Pls.' Ex. 1). This does not mean, however, that the payment to Jacadi USA for delivered merchandise is not an essential obligation of the dealer's contract between Plaintiffs and Jacfran. The Franchise Agreement specifies that Plaintiffs must "[a]cquire and maintain proper inventories of certain supplies, inventory, and equipment, which are set forth in attached Exhibit 'A,' *from Franchisor or from Franchisor's approved suppliers or according to Franchisor's specification and standards.*" (Franchise Agreement § 12.2, Pls.' Ex. 1) (emphasis added). Jacadi USA was Jacfran's designated supplier under section 12.2. (Mr. Bruce Pettibone's Test.). Exhibit "A" states that the required acquisitions include inventory of the different "Jacadi" clothing lines, equipment, supplies, exterior and interior signs, software, and fixtures for the store. (Franchise Agreement, Pls.' Ex. 1, at A–19). This contractual language clearly obliges Plaintiffs to purchase their inventory from whichever entity Jacfran designates as

the authorized supplier—an obligation that is essential under the Agreement because as a franchisee Plaintiffs must maintain proper inventories of "Jacadi" merchandise.

Even without this contractual language, legal, policy, and common-sense considerations dictate that payment for the licensed merchandise—whether to the franchisor or to an approved supplier—constitutes an essential obligation under a franchise agreement such as the one before the Court. After all, the "principal-dealer relationship is one of collaboration in the distribution and sale of a *product." Medina & Medina v. Country Pride Foods, Ltd.,* 122 D.P.R. 172, 22 P.R. Offic. Trans. 172 (1988) (emphasis added). The Franchise Agreement specifically authorized Plaintiffs to use and display the "Jacadi" trademark, (Franchise Agreement § 2.1, Pls.' Ex. 1,). Underlying this authorization is a principal-dealer relationship that encompasses more than the use of trademarks: Plaintiffs' became a "Jacadi" franchisee, authorized to use the "Jacadi" trademarks and bound to sell the "Jacadi" merchandise. Without a contractual relationship for the purchase of "Jacadi" merchandise, the franchise agreement is useless; that is, without the merchandise, the Plaintiffs cannot run the store. (Mr. Pettibone's Test.). It is difficult to conclude that in such a dealer's contract the duty to buy and promptly pay for the merchandise is not an essential obligation of the relationship.

There is no reason to think that the terms of payment for the "Jacadi" merchandise were unlawfully onerous or that Plaintiffs were incognizant of the terms of payment. The terms of payment were reasonable: payment was expected within sixty days of delivery of goods. (Mr. Pettibone's Test.; Defs.' Ex. O). And there is no evidence that Plaintiffs opposed or were

somehow unaware of the terms of payment. These terms initially were agreed upon verbally, and by 1997 they were being included in the "Jacadi" Franchise Operations Manual. (Mr. Pettibone's Test.). At least initially, Plaintiffs had no problems abiding by these terms of payment. (Mr. Pettibone's Test.).

Neither is there any evidence to suggest that the conduct between the parties tacitly altered the terms of payment as to excuse Plaintiffs' untimely performance. The evidence confirms that Plaintiffs continually carried an amount due balance that fluctuated from $50,000 to $190,000. (Mr. Ortega's Test.). It also shows that Defendants had not sent Plaintiffs a letter of default before April 28, 2003, although the due balances in 2000 and 2001 had exceeded $100,000. (Mr. Ortega's Test.). That Defendants tolerated due balances and attempted to resolve the dispute amicably through reasonable payment plans does not mean that they altered the terms and somehow excused Plaintiffs' timely performance, however. *Cf. Dyno Nobel, Inc. v. Amotech Corp.,* 63 F.Supp.2d 140, 150–51 (D.P.R.1999) (finding good cause to terminate when despite repeated efforts by the distributor "to set reasonable payment schedules," the dealer "continued its untimely payments"). Considering that the dealer-distributor relationship is "characterized by the cooperation, stability, and mutual trust it generates," *Medina & Medina,* 122 D.P.R. 172, 22 P.R. Offic. Trans. 172, Defendants acted reasonably: they attempted to accommodate the Plaintiffs and respond to their problems, and only after Plaintiffs' repeated noncompliance did they send a notice of default. Even then, and under terms of the contract, Plaintiffs were given a final chance to cure the defects and avoid the termination of the relationship under the very terms they had accepted in the Franchise Agreement. This conduct is consistent with the cooperation and business judg-

ment necessary to run a franchise; it does not imply a tacit alteration of the terms of payment or an endorsement of untimely payment.

The record does show that the parties *expressly* altered the terms of payment for the "Jacadi" merchandise and that Plaintiffs twice breached these accords. On November 2, 2001, Jacadi USA sent Plaintiffs a proposal for a payment plan for the monies past due to Jacfran and Jacadi USA. (Defs.'s Ex. C). This letter specifies that the payment plan is being offered as a "one-time commercial gesture." (Defs.' Ex. C). Under the plan, Jacadi USA agreed to give Plaintiffs a $6,433.67 interest credit to the Defendants and not to charge additional interests on the past due amounts at issue, on the condition that Plaintiffs pay for the Winter 2001 collection in ninety days, with the first payment due on January 15, 2002, and the second payment due on February 15, 2002. (Defs.' Ex. C). The proposal warned that any "future delays in payment could again result in deliveries being held for credit purposes and interest being charged." (Defs.' Ex. C). Plaintiffs did not comply with the terms of this payment plan. (Mr. Pettibone's Test.).

On April 26, 2002, Defendant Pettibone sent Plaintiffs a second payment plan to allow for the release of the Summer 2002 merchandise and resolve the past due amounts. (Defs.' Ex. E). This letter conditioned the shipment of additional merchandise to Plaintiffs (1) increasing the amount of their line of credit by $50,000; (2) signing a personal guaranty for Jacadi USA and Jacfran; (3) agreeing on a reasonable payment plan for the $79,455 that were outstanding to Jacadi USA for merchandise; and (4) pre-paying half of the $34,532 that were outstanding to Jacfran for royalties. (Defs.' Ex. E). Plaintiffs agreed with this proposal, and sent Defendant Pettibone a letter outlining a pay-

ment plan consisting of equal monthly payments of $11,354 starting on June 5, 2002 and ending on December, 2002. (Defs.' Ex. F). Plaintiffs again failed to abide by the terms of the payment plan. (Mr. Pettibone's Test.).

It is after Plaintiffs failed to abide by this second payment plan that Defendants withheld shipment of the Winter 2002 merchandise and notified Plaintiffs' of their default. At this point Plaintiffs still had a chance to cure the default and avoid termination by paying off the amounts outstanding within thirty-days, as provided in the Franchise Agreement. (Defs.' Ex. H). Plaintiffs owed Defendants $24,571 in royalties and $192,707 in merchandise. (Ex. H). Plaintiffs failed to pay off the amounts outstanding, thus confirming their default. (Mr. Pettibone's Test.).

The evidence thus shows that Defendants had just cause to terminate their relationship with Plaintiffs. Plaintiffs had been granted the license to certain "Jacadi" trademarks and operated a "Jacadi" store. They refused, however, to respect the terms of payment for the merchandise they received, and consistently owed money for the merchandise delivered. Defendants attempted to salvage the relationship by accommodating Plaintiffs. They offered a payment plan, which Plaintiffs accepted, only to have Plaintiffs breach it later. Notwithstanding this breach, Defendants offered Plaintiffs another payment plan to settle their debt. Plaintiffs accepted, but breached again. After three refusals to abide by the terms—terms to which Plaintiffs expressly had agreed— Defendants understandably gave up and refused to provide any further merchandise without certain payment guarantees. These payment guarantees were reasonable and were consistent with the terms of the payment plans. Faced with a pattern of broken promises and breached agreements, Defendants cannot be blamed for

exercising their rights under the contract and under Puerto Rico law to end a dealers' relationship that became unworkable.

### Payment of Royalties to Jacfran

■ Plaintiffs' argument that the payment of royalties to Jacfran was not an essential obligation under the Franchise Agreement fails in the face of case law, the contractual language, and the nature of the relationship between the parties. First, the failure to pay royalties under a dealer's contract can constitute good cause for termination of the agreement. *See Jordan K. Rand, Ltd. v. Lazoff Bros., Inc.*, 537 F.Supp. 587, 598 (D.P.R.1982). Second, the Franchise Agreement itself suggests that the payment of royalties is an essential element. There is a separate section of the Agreement dealing exclusively with the royalty fees, and explaining in detail how the fee is determined. (Franchise Agreement § 7, Pls.' Ex. 1). That same section also provides that the fee must be paid "within ten days following the close of each and every Accounting Period." (Franchise Agreement § 7, Pls.' Ex. 1). This prominent treatment of the royalty fees suggest that its payment was considered an essential obligation under the Agreement.

The essential nature of the obligation to pay the royalty fees is further demonstrated by the nature of the relationship. Jacfran, as the owner of the "Jacadi" trademark, is in the business of granting franchisees licenses to use the trademarks and promote and sell the "Jacadi" merchandise. The royalties constitute the benefit, or the consideration, given to Jacfran in exchange for the right to use the licenses. Without the royalty fees, Jacfran has no business as a "Jacadi" franchisor. To argue that in such a franchisor-franchisee relationship the payment of royalty fees for the use of licensed trademarks is not an essential element of the agreement is absurd.

Having decided that the payment of royalty fees is an essential obligation under the Agreement, the Court also finds that the evidence does not support Plaintiffs' argument that the terms for paying the royalty fees were altered to condone Plaintiffs' failure to pay on time and completely. The Defendants unquestionably were flexible with the collection of outstanding royalty fees much like they were flexible with the collection of outstanding merchandise payments. As in the case of the merchandise payments, however, this flexibility did not entail an alteration of the terms of payment or a license to withhold timely payment. Moreover, Plaintiffs expressly altered the terms of payment for the royalty fees, and subsequently breached these accords, in the same way they altered and later breached the terms of payment for the merchandise they received. Defendants' November 2, 2001, proposed payment plan to Mr. Ortega, which Mr. Ortega accepted four days letter, (Defs.' Ex. D), expressly included $32,181.59 in royalty fees due. (Defs.' Ex. C). The second payment plan, which Mr. Ortega accepted on May 1, 2002, also included the payment of outstanding royalty fees. (Defs.' Ex. F). Plaintiffs twice breached their payment plan agreements. Plaintiffs' failure to pay the royalty fees, along with their breach of the two subsequent payment plans, gave Defendants just cause to terminate the Franchise Agreement.

### Failure to Renew the Agreement

■ Law 75 prohibits principals or grantors from refusing to renew a dealer's contract, except for just cause. 10 P.R. Laws Ann. § 278a. This provision, however, neither declares per se unlawful the parties' attempts to agree upon conditions for renewal nor overturns the Civil Code doctrine of *pacta sunt servanda* (agreements must be respected). *Cf. Nike Int'l Ltd. v. Athletic Sales, Inc.,* 689 F.Supp. 1235, 1238–39 (D.P.R.1988). Court have thus allowed parties to stipulate in their original contract certain conditions for renewal, as long as the conditions are not "contrary to law, morals, or policy." *Id.* Law 75 protects dealers from unilateral refusals to renew, but it does not protect dealers "from their own follies which lead to the preconceived expiration of distribution agreements." *Id.*

■ Here, the Franchise Agreement between the parties provided for automatic renewal if Plaintiffs met the following conditions: (1) "[F]ully performed all of the terms and conditions of this Agreement" and were not "in default of this Agreement"; (2) executed "the then current standard form of franchise agreement, or the most recent form"; (3) gave Jacfran written notice of their decision to renew "not more than twelve months nor less than three months prior to the expiration of the initial term"; (4) executed "a release of any claim [they] may have against Franchisor in form and substance satisfactory to it"; (5) renovated its location to Jacfran's "then-current standards of service, image, safety, sanitation and repair"; and (6) paid a $25,000 franchise renewal fee.[3] (Franchise Agreement § 3.2 & Ad-

---

**3.** Plaintiffs argued that the Addendum to the Franchise Agreement, and not section 3.2, controlled on the issue of renewal. Accordingly, they claimed, renewal was automatic upon payment of the $25,000 renewal fee. The Court rejects Plaintiffs' interpretation of the Franchise Agreement. Paragraph 5 of the Addendum states that renewal is automatic "provided Franchisee is in compliance *with*

*the terms of the Agreement* and this Addendum." (Franchise Agreement, Addendum ¶ 5, Pls.' Ex. 1) (emphasis added). This language clearly means that renewal is automatic upon compliance with the renewal terms contained in section 3.2 of the Agreement. Even if the Plaintiffs' interpretation were correct, Plaintiffs' still did not comply with the terms of the automatic renewal because their

dendum ¶ 5, Pls.' Ex. 1). The Court has doubts as to the lawfulness of requiring the execution of the then-current standard form of the franchise agreement and the execution of a release. The first condition potentially runs contrary to Law 75 by allowing the principal to unilaterally alter the terms of the agreement, 10 P.R. Laws Ann. § 278a, while the execution of the release seems to clash with Law 75's provision that the rights provided under the statute cannot be waived, *id.* § 278c.

The Court's concerns with these conditions does not deprive Defendants of good cause not to renew the Franchise Agreement. Plaintiffs did not comply with some of the other, lawful renewal conditions provided in the Agreement. Plaintiffs never submitted their renewal fee of $25,000. (Mr. Pettibone's Test.). They also refused to perform the renovations agreed upon in the Franchise Agreement. (Mr. Pettibone's Test.). Moreover, Plaintiffs were in default of their obligations under the Agreement. Defendants, then, had good cause not to renew the Franchise Agreement with Plaintiffs.

### Irreparable Harm and Balance of the Equities

■ Plaintiffs' have submitted no evidence showing that failure to grant the preliminary injunctive would lead to irreparable harm. If the Court was later to find, on the merits, that Defendants lacked good cause to terminate or refuse to renew the Franchise Agreement, Plaintiffs certainly would have suffered damages for which Defendants would be liable. There is no indication in the record that these damages would be irreparable, however. The parties are reminded that the Court's findings and decisions at the preliminary injunction stage does not prevent Plaintiffs from later arguing the absence of just cause at trial. *Luis Rosario, Inc. v. Ama-*

*na Refrigeration, Inc.*, 733 F.2d 172, 173 (1st Cir.1984). If Plaintiffs eventually prevail on the merits, they would receive compensation "for the hard-earned clientele unjustly appropriated by the supplier." *Sheils Title*, 184 F.3d at 14. Plaintiffs have not shown that the failure to grant the injunctive relief would cause damages beyond those that can be recovered under Law 75 upon a finding of lack of just cause on the merits.

For these same reasons, the balance of the equities tilts toward Defendants. Because the potential harms to Plaintiffs are not irreparable, and in fact would consist of damages easily recoverable under Law 75, the harms from not granting the injunctive relief do not outweigh the harms that would be inflicted to the Defendants if the relief is granted.

### Policy Considerations

■ Law 75 "unquestionably represents a strong public policy directed to level[ing] the contractual obligations between two groups financially unequal in their strength." *Medina & Medina*, 122 D.P.R. 172, 22 P.R. Offic. Trans. 172. This strong public policy was driven, in part, by the concern with "domestic and foreign manufacturers who, without just cause, terminate their relationship with their representatives and agents in Puerto Rico as soon as the latter have created a favorable market for their products." *Id.* (citing *Roberto, Inc. v. Oxford Indus., Inc.*, 122 D.P.R. 115, 22 P.R. Offic. Trans. 115 (1988)). As the First Circuit has explained, however, "the basic public policy of Law 75 is to prevent dealer termination without 'just cause,'" *Amana Refrigeration*, 733 F.2d at 173. The evidence does not show that Defendants chose to terminate their relationship with Plaintiffs arbitrarily as soon as a favorable market was created. Instead, it shows that Defendants took nu-

---

default in their obligations prevented them from being "in compliance with the terms of

the Agreement" and the they never submitted the renewal fee.

merous steps to avoid terminating the relationship and accommodate the Plaintiffs. In the end, Plaintiffs' breaches and refusal to pay the outstanding balances not only gave Defendant good cause to terminate and refuse to renew, but it created an unworkable relationship, *see Sheils Title,* 184 F.3d at 15 ("At the outset, it is important to note that Law 75 was not intended to prevent termination of unworkable relationships, but only to prevent arbitrary terminations."). Having found that Defendants had just cause to terminate the relationship and refuse to renew the Franchise Agreement, and having found that there is no evidence indicating that Defendants terminated the relationship as soon as the Plaintiffs created favorable market conditions, the denial of Plaintiffs' request for a preliminary injunction is consistent with the policy goals of Law 75.

### CONCLUSION

After examining the evidence on the record and balancing the appropriate considerations, the Court **DENIES** Plaintiffs' request for a preliminary injunction.

**SO ORDERED.**