Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| PAN AMERICAN PROPERTIES, CORP.<br><br>Recurrida<br><br>Vs.<br><br>SAZERAC COMPANY, INC. Y CCI BEER DISTRIBUTORS, INC.<br><br>Peticionarios | KLCE202500119 | *CERTIORARI* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm. BY2024CV03030<br><br>Sobre: INTERDICTO PRELIMINAR; SENTENCIA DECLARATORIA; LEY 75; INCUMPLIMIENTO DE CONTRATO; DAÑOS Y PERJUICIOS; INTERFERENCIA TORTICERA CON RELACIÓN CONTRACTUAL; CONTRATO EN PERJUICIO DE TERCERO; COMPETENCIA DESLEAL |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 27 de junio de 2025.

Comparece la parte peticionaria Sazerac Company, Inc. y CC1 Beer Distributors, Inc., para solicitar la revisión de una *Resolución y Orden* emitida el 4 de febrero de 2025 por el Tribunal de Primera Instancia, Sala Superior de Bayamón. En la cual declaró "con lugar" la solicitud de entredicho preliminar presentada por la parte recurrida, Pan American Properties, Corp. Por ello, prohibió a la parte peticionaria "vender productos de Fireball Cinnamon Malt Beverage en Puerto Rico durante el trámite del pleito de epígrafe".

La parte peticionaria acompañó una *Moción en Auxilio de Jurisdicción,* la cual declaramos "Ha Lugar" el 7 de febrero de 2025.

Número Identificador

SEN2025 _____

Nuestra resolución tuvo el efecto de paralizar los efectos de la *Resolución y Orden emitida* el 4 de febrero de 2025.

Procedemos a resolver con el beneficio de la comparecencia de las partes y la transcripción estipulada de la prueba oral.

**-I-**

El 24 de mayo de 2024, la parte recurrida presentó una *Demanda* contra los peticionarios, adujo menoscabo a su contrato de distribución exclusiva en violación a la *Ley de Contratos de Distribución,* Ley Núm. 75 de 24 junio de 1964, según enmendada, 10 LPRA § 278, *et seq.* (Primera Causa de Acción); Sentencia Declaratoria (Segunda Causa de Acción); daños por violación a la Ley Núm. 75 (Tercera Causa de Acción), daños y perjuicios (Cuarta Causa de Acción); incumplimiento de contrato (Quinta Causa de Acción); intervención torticera con relación contractual (Sexta Causa de Acción): y daños por violaciones a las disposiciones correspondientes del Código Civil relacionadas a la mala fe, la competencia desleal y el enriquecimiento injusto (Séptima Causa de Acción). En resumen, las causas descansan sobre un supuesto menoscabo en la relación contractual entre las partes en donde la parte peticionaria "busca lucrarse injustificadamente de los esfuerzos, la reputación y el buen nombre cultivado por Pan American a lo largo de más de diez (10) años haciendo esfuerzos relacionados a la marca de Fireball Cinnamon Whisky en Puerto Rico". La parte peticionaria solicitó, además, un *injunction preliminar*, según provisto en el Artículo 3-A de la Ley Núm. 75, 10 LPRA sec. 278b-1.

En la vista celebrada el 31 de mayo de 2024, el Tribunal denegó la solicitud de desestimación del *injunction* preliminar presentada por la parte peticionaria y señaló fecha para la celebración de la *Vista de Injunction Preliminar* en sus méritos. La vista ocurrió los días 10, 12, 14, 18, 20 y 21 de junio de 2024. Las

partes estipularon ciertos hechos y varias piezas de evidencia. Las partes además presentaron prueba documental, demostrativa y testimonial durante la vista.

La prueba testifical de la parte recurrida consistió en el testimonio del Sr. Alberto Fernández González, vicepresidente ejecutivo de Pan American; el Sr. Luis Eduardo Albandoz Acevedo, vicepresidente de ventas de Pan American; el Sr. Javier Alejandro Calancha Figueras, *customer business manager* de la División de Licores de Pan American. La prueba testifical de la parte peticionaria estuvo compuesta por el testimonio del Sr. Juan Carlos Román Hernández, director comercial de Centro América y Caribe de Sazerac., y del Sr. Adrián Jorge Rivera Cebollero, vicepresidente de ventas y mercado de CC1. Celebrada la vista el foro de primera instancia formuló las siguientes determinaciones de hechos:

1. SCI designó a Pan American como distribuidor de Fireball Cinnamon Whisky y Chila Orchata en Puerto Rico mediante una comunicación del 1 de agosto de 2013. (Estipulado)

2. La referida comunicación estableció en lo pertinente lo siguiente:

> Our company, Sazerac Company, Inc. ("SCI"), is the rightful owner of the trademark rights for Fireball Cinnamon Whisky and Chila Orchata and, as such, has the worldwide authority to appoint and terminate its distributors, importers, and agents at its sole discretion.
>
> Therefore, we are pleased to confer to your company, Pan American Properties Corp ("Distributor"), whose main purpose is the distribution of alcoholic beverages in Puerto Rico, authorization to sell the brands noted above in the country of Puerto Rico. This privilege is effective immediately and valid unless sooner terminated by SCI for any reason.
>
> Distributor shall use its best effort to sell, promote, merchandise, and grow overall business in accordance with Puerto Rico laws, and in keeping with SCI´S sales and marketing guidelines and budgets. Distributor agrees to provide SCI with all reporting sales and other information as requested by SCI.
>
> Distributor acknowledges that SCI is the owner or licensee, as applicable, of all brands, formulas, labels, designs, trademarks, trade

names, trade dress, designs and other indicia of ownership, origin and quality of the Products ("Intellectual Property") and all of the goodwill attributable thereto. Distributor may make use of the Intellectual Property only as authorized by SCI in writing and any use shall inure solely to the benefit of SCI or its affiliated companies. Distributor further acknowledges that nothing in this Agreement or in its relationship with SCI gives Distributor any right, title or interest in or to such Intellectual Property, other than as a distributor of the Products pursuant this Agreement. Distributor shall make no contrary representations or claims. Distributor shall cease all use of the Intellectual Property upon the termination of this Agreement either in part with respect to a particular Product or in full.

3. La referida comunicación estableció, entre otras cosas, que Pan American emplearía sus mejores esfuerzos ("best efforts") para vender, promocionar, mercadear, comercializar y crecer el negocio relacionado a Fireball Cinnamon Whisky y Chila Orchata, conforme a las leyes de Puerto Rico y según las guías de venta y mercadeo de SCI. (Estipulado)

4. Al presente CC1 distribuye Fireball Cinnamon Malt Beverage en Puerto Rico. (Estipulado)

5. Pan American distribuye Fireball Cinnamon Whisky en Puerto Rico. (Estipulado).

6. En cumplimiento con el acuerdo de distribución con SCI, Pan American introdujo la marca Fireball Cinnamon Whisky al mercado de Puerto Rico.

7. Previo al año 2013, la marca Fireball Cinnamon Whisky de SCI no tenía presencia alguna, ni se había vendido en el mercado de Puerto Rico.

8. Desde el año 2013 hasta la introducción del producto Fireball Cinnamon Malt Beverage en mayo de 2024, solamente Pan American había distribuido productos de la marca Fireball Cinnamon en Puerto Rico.

9. Desde el año 2013 hasta el presente, Pan American ha desarrollado la marca Fireball Cinnamon Whisky a través de todo Puerto Rico con el trabajo de su equipo de distribución y mediante inversiones monetarias significativas.

10. Las gestiones realizadas por Pan American en relación a Fireball Cinnamon Whisky incluyen, entre otras, la creación de un fondo especial de mercadeo en el que SCI y Pan American se dividen los costos de manera equitativa (50/50).

11. Cuando Pan American comenzó a vender el Fireball Cinnamon Whisky en Puerto Rico, creo la categoría de "flavored whiskeys".

12. Para el 2022, Fireball Cinnamon Whisky representaba un 97% de las ventas de esa categoría en Puerto Rico. Es decir que Pan American llevó el producto desde cero a 97%, entre el 2013 y el 2022.

13. Pan American ha logrado posicionar a Fireball Cinnamon Whisky como la marca número tres (3) de whisky en el mercado de Puerto Rico del 2019 a 2022.

14. Pan American ha alcanzado que el producto de Fireball Cinnamon Whisky se distribuya en el 98% de los canales de distribución "off-site" en Puerto Rico, en el 99% de las cadenas de tiendas grandes, en el 91% de las cadenas de tiendas pequeñas, y en el 96% de las tiendas de licores.

15. Desde 2013 al presente, la relación de distribución para Fireball Cinnamon Whisky entre SCI y Pan American ha continuado de manera ininterrumpida. De igual manera, los esfuerzos de Pan American han continuado a pesar de las dificultades por las que ha atravesado Puerto Rico recientemente, tales como huracanes, terremotos y la pandemia de COVID-19.

16. Luego de una relación de muchos años, SCI aumentó la cantidad de sus productos a ser distribuidos por Pan American, y en el 2017 y 2018, respectivamente, le otorgó a Pan American la distribución de otros productos en Puerto Rico como el ron Black Magic y Fris Vodka.

17. Desde el comienzo de su relación en el 2013, la conducta de SCI y Pan American ha reconocido que existe una relación exclusiva para la distribución de Fireball Cinnamon Whisky en Puerto Rico.

18. La única entidad que ha distribuido Fireball Cinnamon Whisky en Puerto Rico ha sido Pan American.

19. El vínculo contractual entre Pan American y SCI para la distribución exclusiva de Fireball Cinnamon Whisky en Puerto Rico está documentado mediante las transacciones efectuadas entre ambas entidades, las gestiones de Pan American en el mercado de Puerto Rico y las comunicaciones intercambiadas sobre temas relacionados.

20. A fines de 2019, Pan American hizo negociaciones con Puerto Rico Supply, un distribuidor de productos y bebidas alcohólicas, para distribuir el producto Fireball Cinnamon Whisky a gasolineras y negocios pequeños conocidos en la cadena de distribución como "down the trade".

21. SCI, según expresado por su representante en ese momento Ken Chapman, estuvo de acuerdo con dicha estrategia.

22. Como resultado de esa estrategia se añadieron cientos de puntos de venta para la distribución del producto.

23. En relación a esos clientes en los que Puerto Rico Supply entrega los productos, Pan American paga las promociones y negocia los precios. Dichos comercios venden al mismo precio al detal, cualquier costo de Puerto Rico Supply va contra el margen de ganancia de Pan American no se afecta el precio de venta al consumidor.

24. Alrededor de septiembre de 2021, a través del Sr. Ken Chapman, SCI se comunicó con Pan American acerca de la introducción en el mercado de Puerto Rico de un producto nuevo denominado Fireball Cinnamon Malt Beverage a venderse en envases de 50ml.

25. El producto de Fireball Cinnamon Malt Beverage se venderían a un precio menor que el Fireball Cinnamon Whisky. La intención era vender el producto de malta en la botella de 50ml por noventa y nueve centavos ($0.99).

26. El producto de Fireball Cinnamon Malt Beverage no es whisky, sino una bebida de malta ("malt beverage") con sabor a whisky y un nivel de alcohol por volumen de 16.5%, comparado con el 33% de Fireball Cinnamon Whisky.

27. Pan American y SCI intercambiaron múltiples comunicaciones en relación a la contratación de la introducción y distribución del producto de malta en Puerto Rico.

28. Luego de múltiples comunicaciones, no se concretó el acuerdo para la distribución del nuevo producto Fireball Cinnamon Malt Beverage por Pan American, porque no se pusieron de acuerdo en el precio para que pudiera venderse el producto al detal a $0.99 y sin la utilización de subdistribuidores, según la estrategia establecida por SCI.

29. El producto de 50ml de Fireball Cinnamon Malt Beverage es muy similar al de Fireball Cinnamon Whisky de 50ml. Las etiquetas de ambos comparten múltiples elementos distintivos idénticos, tales como: el color amarillo, una figura de un dragón o demonio rojo escupiendo una bola de fuego; las palabras red y hot a cada lado de dicha figura; el diseño del borde de la etiqueta semejante a un papel quemado; el tipo, el tamaño y el color de las letras de la palabra Fireball, hot y red; la ubicación del texto y los colores utilizados en el fondo; la ubicación de los elementos principales (borde, demonio, palabras red, hot, Fireball y Cinnamon) en la composición del diseño de la etiqueta; el sabor a canela, entre otros. Además, la botella de 50ml para ambos productos es del mismo tamaño, tiene la misma forma, tiene una tapa roja y el líquido adentro de la misma tiene el mismo color ámbar.

30. Dada la gran similitud entre la presentación utilizada para Fireball Cinnamon Malt Beverage y la de Fireball Cinnamon Whisky de 50ml, a un consumidor promedio le resultaría difícil distinguir entre ambos productos.

31. SCI reconoce que, debido a su similitud, ambos productos pueden competir cuando se venden en el mismo tamaño. También reconoce que el tamaño de 50ml, a distancia no se puede identificar cuál es uno y cuál es el otro.

32. De acuerdo a SCI, el Fireball Cinnamon Malt Beverage está hecho para que tenga el mismo sabor y provea al consumidor una experiencia similar a la del producto de whisky.

33. SCI conoce que en el mercado de Puerto Rico el consumidor conoce a ambos productos (el de malta y el whisky) como Fireball.

34. Las diferencias entre ambos productos son: su precio, contenido de alcohol por volumen (whisky tiene 33 % y el 50ml de malta 16.5%), naturaleza del producto por su forma de manufactura (destilado vs. fermentado) y trato de las autoridades fiscales para requisitos de etiquetado y tributación.

35. En Puerto Rico, al igual que en otras jurisdicciones, Fireball Cinnamon Whisky se vende en botellas de 50ml. Además, se vende en botellas de 200ml, 750ml, 1 litro y 3 cuartos.

36. El tamaño que más vende Pan American es el 750ml. Las ventas de ese tamaño representan un 90% del total de las ventas del producto.

37. Los planes de SCI con respecto a la distribución de Fireball Cinnamon Malt Beverage en Puerto Rico incluyen venderlo en botellas de 50ml y actualmente se vende en botellas de ese tamaño.

38. Los planes de SCI con respecto a la distribución de Fireball Cinnamon Malt Beverage en Puerto Rico incluyen venderlo en comercios en donde también se vende Fireball Cinnamon Whisky de 50ml, como gasolineras, tiendas de conveniencia, chinchorros y otros comercios "down the trade". Actualmente se vende de esa forma.

39. La estrategia de mercadeo de Fireball Cinnamon Whisky de 50ml es como compra de impulso. La estrategia para el nuevo producto Fireball Cinnamon Malt Beverage también es como compra de impulso.

40. La posible confusión entre Fireball Cinnamon Malt Beverage y Fireball Cinnamon Whisky es común, razonable y predecible y ha sido objeto de múltiples demandas a nivel federal en otras jurisdicciones.

41. Previo a Fireball Cinnamon Malt Beverage, los únicos productos con la denominación "Fireball Cinnamon" de SCI vendidos en Puerto Rico habían sido distribuidos por Pan American.

42. Los productos de Fireball Cinnamon Malt Beverage son una extensión y un derivado de la marca "Fireball Cinnamon".

43. Los productos de Fireball Cinnamon Malt Beverage constituyen un nuevo modelo de la marca "Fireball" y "Fireball Cinnamon".

44. Las representaciones de SCI a Pan American sobre Fireball Cinnamon Malt Beverage incluyeron expresar que sería un producto revolucionario ("game changer") y que venderían sobre cincuenta mil (50,000) cajas del producto.

45. Como parte de las negociaciones para la distribución del producto de malta, SCI le solicitó expresamente a Pan American que preparara las etiquetas correspondientes de Fireball Cinnamon Malt Beverage a utilizarse en Puerto Rico de conformidad con la reglamentación local aplicable.

46. Pan American hizo las gestiones para lograr la aprobación del etiquetado de Fireball Cinnamon Malt Beverage en el Departamento de Hacienda de Puerto Rico y logró la aprobación gubernamental necesaria para importar los productos a Puerto Rico.

47. SCI aprobó la etiquetación de Fireball Cinnamon Malt Beverage específicamente para Puerto Rico, la cual

incluía a Pan American como el distribuidor del producto.

48. El 23 de noviembre de 2021 representantes de SCI llevaron a cabo una visita presencial para conocer el mercado de Puerto Rico ("market visit") junto con representantes de Pan American.

49. Durante la referida visita se discutió específicamente la introducción de los productos de Fireball Cinnamon Malt Beverage al mercado de Puerto Rico. Pan American expresó sus preocupaciones sobre el hecho de que el por ciento de alcohol por volumen (ABV) de Fireball Cinnamon Malt Beverage es más bajo al de Fireball Cinnamon Whisky y el impacto que dicha diferencia podría tener en la percepción de la marca en los consumidores.

50. En algunos estados de los Estados Unidos no se puede vender Fireball de whisky en tiendas de conveniencia. Por eso SCI introdujo el Fireball Cinnamon Malt Beverage, para vender producto Fireball en los estados donde no se podían vender el whisky en tiendas de conveniencia.

51. La estrategia de precios y mercadeo que persigue SCI a nivel nacional para la bebida de malta es la venta de ésta (1) a un precio asequible para, con ello, provocar su compra y (2) en puntos de venta, tales como colmados y estaciones de gasolina, sin que intervenga ningún subdistribuidor.

52. SCI reconoce que su estrategia es de no hacer esfuerzos para diferenciar los productos de Fireball Cinnamon Malt Beverage de los productos de Fireball Cinnamon Whisky y en su lugar enfocarse en acceso al mercado ("market access").

53. SCI reconoce que, al analizar las fortalezas y las amenazas, las debilidades y las oportunidades del producto Fireball Cinnamon Whisky, una de las amenazas son los productos de malta.

54. El 17 de diciembre de 2021 Pan American sometió a SCI una orden de compra para adquirir 432 cajas de Fireball Cinnamon Malt Beverage de SCI (la "Primera Orden de Compra").

55. La Primera Orden de Compra de productos de Fireball Cinnamon Malt Beverage nunca fue entregada a Pan American por SCI.

56. En junio de 2022, el Sr. Juan Carlos Román, Director Comercial de Centro América y Caribe de SCI, realizó una visita a Puerto Rico y se reunió con representantes de Pan American. Durante la referida visita el representante de SCI se reunió con el Sr. Alberto Fernández y le indicó que quería negociar la terminación de la relación de distribución exclusiva entre Pan American y SCI para Fireball Cinnamon Whisky en Puerto Rico. Le indicó que no estaba contento con el desempeño de Pan American, que les interesaba consolidar todos sus productos en un solo distribuidor, pero le aclaró que no sería Pan American. Por su parte, Pan American le confirmó que no le interesaba renunciar a sus derechos como distribuidor exclusivo de SCI.

57. El 20 de junio de 2022, SCI envió una carta a Pan American en la que expresó por escrito que estaban insatisfechos con las ventas de sus marcas en Puerto Rico, incluyendo Fireball Cinnamon Whisky. SCI indicó que estaban en proceso de evaluar y analizar sus canales de distribución en Puerto Rico y estaban considerando todas las opciones viables para llegar a una solución que fuese beneficiosa para ambas partes, incluyendo terminar la relación mediante una resolución negociada.

58. Luego de julio de 2022, Pan American sigue siendo el mayor distribuidor de SCI en Puerto Rico.

59. SCI no le ha notificado ninguna insatisfacción con el desempeño de Pan American después julio de 2022.

60. El 8 de julio de 2022, Pan American presentó a SCI una segunda orden de compra para adquirir 216 cajas de Fireball Cinnamon Malt Beverage de SCI (la "Segunda Orden de Compra").

61. La Segunda Orden de Compra para Fireball Cinnamon Malt Beverage nunca fue entregada a Pan American por SCI.

62. El 26 de julio de 2022 SCI envió una carta a Pan American en la que indicó que continuaba habiendo una "desalineación" en cuanto a la mejor estrategia para vender y mercadear sus productos en Puerto Rico. En la misma indicó, que continuaría honrando las órdenes de compra para productos de SCI que previamente habían sido vendidos a Pan American, pero que no aceptarían órdenes de compra para productos que no habían sido vendidos previamente a Pan American incluyendo productos de Fireball Cinnamon Malt Beverage.

63. En o alrededor de octubre de 2023 Pan American advino en conocimiento de que SCI había notificado a ciertos comercios que estaría distribuyendo Fireball Cinnamon Malt Beverage en Puerto Rico a través de otra entidad.

64. El 20 de octubre de 2023, Pan American envió una comunicación a SCI y a CC1 mediante sus representantes legales en la que notificó las actuaciones que consideraba ilegales tanto de SCI como de CC1 y reclamó sus derechos como distribuidor exclusivo de la marca Fireball Cinnamon Whisky en Puerto Rico bajo la Ley 75.

65. El 26 de diciembre de 2023, SCI envió una comunicación a Pan American en la que negó que Pan American fuese un distribuidor exclusivo conforme a la Ley 75. Además, indicó que independientemente de la exclusividad que pudiera existir en cuanto a la distribución de productos de Fireball Cinnamon Whisky, Pan American no distribuiría los productos de Fireball Cinnamon Malt Beverage en Puerto Rico debido al uso de subdistribuidores por parte de Pan American.

66. El 15 de febrero de 2024 Pan American contestó la referida misiva exponiendo detalladamente las razones por las cuales entendía que la postura asumida por SCI era errónea y le reiteró su intención de defender sus derechos como distribuidor exclusivo bajo la Ley 75.

67. El 23 de abril de 2024, SCI envió una comunicación formal escrita dirigida a las cadenas de supermercados

de Puerto Rico indicando que SCI, como suplidor exclusivo de Fireball Cinnamon Malt Beverage en Puerto Rico, estaba informando que CC1 sería el distribuidor y mercader de Fireball Cinnamon Malt Beverage para todo el territorio de Puerto Rico.

68. CC1 es un distribuidor de bebidas alcohólicas con conocimiento pleno del mercado de Puerto Rico y competidor directo de Pan American.

69. A finales de 2021 CC1 comenzó a distribuir para Puerto Rico el whisky Sheepdog, que es un producto de SCI.

70. CC1 acordó asumir la distribución exclusiva de Fireball Cinnamon Malt Beverage en Puerto Rico.

71. CC1 tenía conocimiento de que Pan American es el distribuidor exclusivo de Fireball Cinnamon Whisky en Puerto Rico cuando suscribió un acuerdo con SCI para la distribución de productos de Fireball Cinnamon Malt Beverage para mediados de 2023.

72. SCI designó a CC1 como el distribuidor exclusivo de Fireball Cinnamon Malt Beverage en Puerto Rico mientras Pan American continuaba siendo el distribuidor de Fireball Cinnamon Whisky en la isla.

73. CC1 comenzó a vender el producto de malta en Puerto Rico el 22 de mayo de 2024.

74. CC1 distribuye Fireball Cinnamon Malt Beverage en puntos de venta de Puerto Rico en los que Pan American distribuye Fireball Cinnamon Whisky.

75. SCI le vende la caja de botella de 50ml a CC1 a $54.00, precio que nunca le ofreció a Pan American.

76. CC1 no utiliza subdistribuidores para vender el Fireball Cinnamon Malt Beverage.

77. El precio de Fireball Cinnamon Malt Beverage de 50ml en puntos de venta mayormente se encuentra a un dólar ($1.00).

78. En su contrato con SCI, CC1 hizo un compromiso de comprarle a SCI 50,000 cajas en por un año.

79. Al 21 de junio de 2024, ya habían llegado a Puerto Rico 4,104 cajas del producto de malta.

80. El precio al cual CC1 les vende a sus detallistas es de $6.50 la caja de 10 botellitas. Cada caja tiene 12 cajitas de 10 botellitas.

81. CC1 ya pagó el arbitrio por las 4,104 cajas recibidas.

82. La venta bruta de CC1 con relación a las 4,104 cajas ya compradas es $320,112.00. Si se proyecta eso a 50,000 cajas, el total sería $3,900,000.00.

83. La venta total que CC1 realizaría en la eventualidad de que vendiera las 50,000 cajas que es el objetivo, seria $3,900,000.00.

84. Las ventas anuales de CC1 en Puerto Rico para el año 2023 fue de 700 millones de dólares. Por lo tanto, si se proyectara que CC1 cumple con toda la estrategia de venta, la venta total de Fireball Cinnamon Malt Beverage

representaría menos del medio del 1% de las ventas totales anuales de CC1.

85. La publicidad que pone CC1, reconoce que el producto de malta es un nuevo Fireball, porque existe otro Fireball. Sin embargo, no destaca que el producto es con base en malta, ni el por ciento (%) de alcohol por volumen. Lo que destaca es el demonio de Fireball y la botella y un precio de $0.99 más IVU.

86. Luego de la introducción del Fireball Cinnamon Malt Beverage al mercado de Puerto Rico, algunos comercios han dejado de ordenarle a Pan American el Fireball Cinnamon Whisky de 50ml y otros han reducidos la cantidad de sus órdenes.

87. Pan American le distribuye Fireball Cinnamon Whisky a las localidades de la cadena de supermercados en Puerto Rico.

88. Algunos supermercados, identifican el paquete de diez (10) botellas de 50ml con la etiqueta de Fireball Cinnamon Malt Beverage, como Fireball Cinnamon.

El tribunal denegó la reconsideración solicitada por la parte peticionaria. Todavía inconforme, la parte peticionaria comparece y señala los siguientes errores:

Erró el Honorable Tribunal de Primera Instancia al emitir un *injunction* preliminar a favor de una parte que no es, ni ha sido, el distribuidor del producto Fireball Malt.

Erró el Honorable Tribunal de Primera Instancia al determinar que la alegada posibilidad de confusión entre los productos Fireball Malt y Fireball Whisky constituye un menoscabo a la relación de distribución bajo la Ley 75 que justifica la concesión de un *injunction* estatutario.

Erró el Honorable Tribunal de Primera Instancia al conceder un remedio de *injunction* ineficaz e inconsistente con la demanda enmendada.

Erró el Honorable Tribunal de Primera Instancia al emitir el *injunction* preliminar solicitado por la recurrida, aun cuando en el balance de intereses la emisión de dicho remedio provisional era improcedente.

Las partes presentaron su respectivo alegato y estipularon la transcripción de la prueba oral. Procedemos a resolver con el beneficio de las posturas de las partes, la transcripción de la prueba y el derecho aplicable.

## -II-

### -A-

La *Ley de Contratos de Distribución,* Ley Núm. 75 de 24 junio de 1964, según enmendada, 10 LPRA sec. 278, *et seq.* ("Ley Núm. 75-

1964") provee remedio en daños cuando las empresas domésticas y extranjeras eliminan o menoscaban sin justa causa las relaciones comerciales establecidas con sus distribuidores, concesionarios o agentes. *Véase,* Exposición de Motivos, Ley Núm. 75-1964. La ley crea una causa de acción en daños a disposición de los distribuidores cuando son despojados, sin justa causa del negocio gestado a favor del producto introducido. *Next Step Medical v. Bromedicon et al.,* 190 DPR 474, 489 (2014); *Cruz Marcano v. Sánchez Tarazona,* 172 DPR 526, 540 (2007); *Medina & Medina v. Country Pride Foods, Ltd.,* 122 DPR 172, 189 (1988). A tenor con el Artículo 2 de la *Ley de Contratos de Distribución,* 10 LPRA sec. 278a, un principal no podrá dar por terminada una relación existente en virtud de un contrato de distribución o realizar actos directos o indirectos en menoscabo de la relación establecida o negarse a renovar el contrato a su vencimiento normal, excepto medie justa causa según definido por el estatuto. *Next Step Medical v. Biomet, Inc.,* 195 DPR 739, 747 (2016); *Systema de PR v. Interface Int'l, Inc.,* 123 DPR 379, 386 (1989).

Le corresponde al principal demostrar justa causa para eludir su responsabilidad. *Next Step Medical v. Biomet, Inc., supra,* pág. 754. El Tribunal Supremo explicó:

> La Ley Núm. 75 fue diseñada con el propósito expreso de proteger los derechos legítimos de los distribuidores y remediar los perjuicios causados a éstos. Ello, en relación a las prácticas abusivas de principales que, sin justa causa, menoscaban arbitrariamente las relaciones contractuales con los distribuidores, tan pronto éstos crean un mercado favorable a sus productos y servicios. El aludido esquema legal impide que un principal se apropie injustamente de la plusvalía de un negocio después de que un distribuidor local ha conquistado un mercado y una clientela a través de su gestión empresarial. En mérito de lo anterior, reiteradamente hemos expresado que la Ley Núm. 75 crea una causa de acción a favor de los distribuidores para detener el incumplimiento del principal y ser compensados en daños cuando, luego de introducir productos en el mercado y lograr su reconocimiento social y ventas suficientes, son despojados, sin justa causa, del negocio gestado.
>
> *Next Step Medical v. Bromedicon et al., supra,* pág. 489.

El legislador confirió al tribunal el poder de conceder remedios provisionales o medidas de naturaleza interdictal durante el curso

de un litigio al amparo de la Ley Núm. 75-1964. *Véase, Next Step Medical, v. Biomet, Inc., supra.* Ello, pues, se interesaba "evitar la realización de actos que podrían producir daños irreparables, mientras se dilucida la existencia o no, de justa causa para la terminación de la relación contractual". *Next Step Medical, v. Biomet, Inc., supra*, pág. 490. El estatuto busca propiciar estabilidad en las relaciones de distribución en Puerto Rico y erradicar prácticas que, inciden sobre las expectativas legítimas que las partes vinculadas respectivamente ostentan. *Next Step Medical v. Bromedicon et al., supra*, pág. 488. El propósito de estos remedios también es "evita[r] el debilitamiento del distribuidor en esta etapa crucial del conflicto y nivela[r] el poder real de las partes. A manera de un primer auxilio, equivale a un torniquete que evita que se desangre el distribuidor mientras reclama los derechos consagrados en la Ley Núm. 75". *Systema de P.R., Inc. v. Interface Int'l, supra*, pág. 387.

El Artículo 3-A de la Ley Núm. 75-1964, 10 LPRA sec. 278b-1, establece que el tribunal puede conceder remedios provisionales o medidas interdictales, a través de las que deberán mantenerse vigentes los términos del contrato de distribución, mientras el tribunal resuelve los méritos de la controversia respecto a la justa causa para la terminación del acuerdo de distribución y si procede la concesión de remedios, al amparo del Artículo 3 de la Ley Núm. 75-1964. *Véase, Next Step Medical v. Bromedicon et al., supra.* El Artículo 3-A lee:

> En cualquier pleito en que esté envuelta directa o indirectamente la terminación de un contrato de distribución o cualquier acto en menoscabo de la relación establecida entre el principal o concedente y el distribuidor, el tribunal podrá conceder durante la pendencia del pleito, cualquier remedio provisional o medida de naturaleza interdictal para hacer o desistir de hacer, ordenando a cualquiera de las partes o a ambas a continuar, en todos sus términos, la relación establecida mediante el contrato de distribución, y/o a abstenerse de realizar acto u omisión alguna en menoscabo de la misma. En todo caso en que se solicite el remedio provisional aquí provisto el tribunal considerará los

intereses de todas las partes envueltas y los propósitos de política pública que informa este capítulo.

Corresponde al distribuidor agraviado probar el impacto negativo en sus operaciones comerciales a causa del menoscabo o la terminación de la distribución, según sea el caso, para poder obtener un *injunction* a su favor. La parte peticionaria del remedio no tiene que necesaria o forzosamente probar lo siguiente: (1) la existencia de daños irreparables; (2) la falta de justa causa para el menoscabo o terminación del vínculo contractual, y (3) la probabilidad de prevalecer en el juicio en su fondo. *Next Step Medical v. Bromedicon, supra,* págs. 497-499. Por su parte, el principal debe refutar los argumentos presentados por el promovente o evidenciar el detrimento que sobrevendrá a sus negocios, productos, o servicios, de obligarlo a mantener la relación *pendente lite. Véase, Systema de PR v. Interface Int'l, supra.* El juzgador deberá evaluar las posturas de cada parte conforme al propósito socioeconómico del estatuto. *Next Step Medical v. Biomet, Inc., supra,* pág. 755.

El remedio que contempla el Artículo 3-A es provisional. El estatuto limita su aplicación a un término de tiempo definido. Expresamente dispone que el tribunal podrá conceder cualquier medida interlocutoria "durante la pendencia del pleito". Artículo 3-A de la Ley Núm. 75-1964, *supra.*

### -*B*-

El auto de *certiorari* es el vehículo procesal extraordinario utilizado para que un tribunal de mayor jerarquía pueda corregir un error de derecho cometido por un tribunal de menor jerarquía. *Pueblo v. Colón Mendoza,* 149 DPR 630, 637 (1999). Distinto al recurso de apelación, el tribunal de superior jerarquía tiene la facultad de expedir el auto de *certiorari* de manera discrecional, por tratarse de ordinario de asuntos interlocutorios. Sin embargo,

nuestra discreción debe ejercerse de manera razonable, procurando siempre lograr una solución justiciera, como ya señalamos. *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 98 (2008); *Negrón v. Srio. de Justicia*, 154 DPR 79, 91 (2001).

Por su parte, la Regla 40 del Reglamento de este Tribunal, establece los criterios que debemos tomar en consideración al atender una solicitud de expedición de un auto de *certiorari*. A esos efectos, la referida Regla dispone:

> El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> A. Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> B. Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> C. Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> D. Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
>
> E. Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
>
> F. Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
>
> G. Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.
>
> 4 LPRA Ap. XXII-B, R. 40.

### -III-

Por medio de sus cuatro señalamientos de error, la parte peticionaria argumenta sobre la improcedencia del entredicho provisional autorizado por el tribunal. Conforme aduce, la relación contractual entre las entidades comerciales no gira en torno a la distribución exclusiva del producto *Fireball Cinnamon Malt*

*Beverage*. Por ello, el remedio interdictal no puede estar disponible a la parte recurrida en relación con un producto que nunca distribuyó. Según el peticionario, el remedio provisional emitido tuvo el efecto de rescribir las relaciones contractuales entre las partes y, además, contraviene el Artículo 3-A de la Ley de Contratos de Distribución, Ley Núm. 75-1964, 10 LPRA sec. 278b-1. Esto, ya que, el vínculo legal entre Pan American y Sazerac es únicamente en torno a la distribución del *Fireball Cinnamon Whisky* en Puerto Rico, y no del producto *Fireball Cinnamon Malt Beverage.* Así, el peticionario nos invita a revisar los contornos estatuidos para la puesta en vigor del entredicho establecido en la Ley Núm. 75-1964.

La doctrina interpretativa del Artículo 3-A señala los confines conforme a los cuales el tribunal debe adjudicar una petición de tal naturaleza. El análisis de la expedición del remedio extraordinario requiere *prima facie* al recurrido establecer su carácter de distribuidor y, por ende, que está cobijado por las disposiciones de la Ley Núm. 75-1964. *Next Step Medical v. Bromedicon, supra*, pág. 464. En gran medida, de ello dependerá la procedencia del remedio interdictal solicitado, y la probabilidad de que, el recurrido prevalezca bajo la acción instada al amparo del estatuto. *Íd.*, págs. 494-495.

En el presente caso no existe controversia sobre el carácter de distribuidor que ostenta la parte recurrida respecto al producto *Fireball Cinnamon Whisky* en Puerto Rico. La parte peticionaria nombró a la recurrida como agente y distribuidor exclusivo de varios de sus productos en Puerto Rico, entre ellos *Fireball Cinnamon Whisky.* El contrato no especifica el plazo de duración de la relación comercial. Los precios de los productos se fijan por mutuo acuerdo. La parte recurrida tiene a su cargo la promoción del producto y ambas partes comparten los gastos publicitarios. Por tanto, la parte recurrida es un distribuidor protegido por la Ley Núm. 75-1964. *Íd.*

La finalidad del *injunction* preliminar objeto de este recurso es prevenir infracciones a las disposiciones de la Ley Núm. 75-1964. Por tal razón, el escrutinio con respecto a su expedición o denegatoria debe ceñir si el remedio cumple con las disposiciones y exigencias del estatuto del cual proviene. *Íd.*, pág. 497. En atención a tales lindes, correspondía al recurrido también, probar el impacto negativo en sus operaciones comerciales a causa del menoscabo alegado. En otras palabras, demostrar un menoscabo y que tal acción afectó negativamente la operación comercial del recurrido.

El alegato del recurrido expone una supuesta disminución en clientes y ventas del producto *Fireball Cinnamon Whisky* por la introducción al mercado del *Fireball Cinnamon Malt Beverage 50 ml* por Sazerac mediante un distribuidor distinto, CC1. En particular la parte recurrida aseguró la disminución en sus ventas, confusión entre los productos y el aprovechamiento de CC1 del mercado creado por Panamerican Grain Properties para el *Fireball Cinnamon Whisky.*

El vicepresidente ejecutivo de la parte recurrida, el señor Alberto Fernández González, testificó sobre los esfuerzos de la corporación para la introducción al mercado local de la bebida *Fireball Cinnamon Whisky* para el año 2013:

> P. Explíquele al Tribunal qué esfuerzo, si alguno, hizo Pan American Properties para introducir ese producto de Fireball al mercado en Puerto Rico.
>
> R. Pues una de las razones que, cuando Chapman vino a mi oficina, fue que él había evaluado el mercado de Puerto Rico, había visto lo que nosotros estábamos haciendo con Gasolina Sangría, y entonces, pues, dijo: "Ustedes tienen uno accesos al mercado, tiene una muy buena distribución, y Fireball va a ser un buen complemento".
>
> Entonces nosotros usamos esa iniciativa de incluir a Fireball en actividades y eventos de Gasolina para introducir el producto al mercado en Puerto Rico.
>
> P. ¿Cuántos productos bajo la marca Fireball existían en ese momento?
>
> R. Uno nada más.
>
> P. ¿Cuál era?

R. Fireball Cinnamon Whisky.

P. Okey. ¿Puede usted describirle al Tribunal en qué consiste ese producto?

R. Es un licor de Whisky con sabor a canela.

[...]

P. ¿Qué conocimiento, si alguno, usted tiene sobre el consumidor del producto Fireball que usted ha mencionado, en Puerto Rico?

R. Bueno, yo personalmente estuve envuelto en el lanzamiento de Fireball. Y puse muchas noches en muchos eventos, en muchas barras de noche, cuando estábamos viendo cómo introducir el producto, porque era un producto novel. En la categoría de whisky no había un flavored whisky. Y tratar de venderlo a los clientes de nosotros, "Prueba un whisky de canela", pues al principio fue bastante complicado poder expresar eso.

Una de las estrategias que hicimos, en aquella época había un producto llamado – que todavía existe – Jägermeister, que se usaba mucho de shot, y entonces nosotros fuimos con la estrategia de atacar ese mercado de shot y poner máquinas al lado de Jägermeister, hasta que eventualmente desplazamos prácticamente a Jägermeister del mercado.[1]

El ejecutivo continuó su testimonio sobre los esfuerzos de distribución e inversiones de mercadeo para lograr el reconocimiento del consumidor local de la nueva marca:

P. En esa etapa inicial, cuando están introduciendo el producto al mercado de Puerto Rico, allá para el año 2013-2014, ¿qué inversión, si alguna, usted conoce haya – hizo Sazerac para promocionar ese producto en Puerto Rico?

R. Bueno, en esos primeros dos años iniciales aproximadamente, habíamos quedado que se iba a hacer una contribución de cinco dólares por caja, si la memoria no me falla, que se estaba dividiendo 50 por ciento y 50 por ciento. Pero eso estaba limitado a gastos realmente relacionados con productos gratis, promociones que se hicieran en barras, y una que otra – comprar una que otra máquina de las que se usaban para enfriar el producto para shots en las barras.

No incluía, y eso lo que nosotros veníamos haciendo con Gasolina Sangría y con Gasolina, los gastos de billboards, eventos especiales, festivales, fiestas patronales. Ellos no creían en eso, entonces se limitó el 50 por ciento a esa partida, que es lo que ellos autorizaban.

Pero nosotros incurrimos en otros gastos a pesar de que no fuimos reembolsados por Sazerac.[2]

El resultado de los esfuerzos de la corporación quedó verificado en el siguiente testimonio del vicepresidente ejecutivo:

---

[1] *Transcripción de la prueba oral*, págs. 31-34.
[2] *Íd.*, págs. 35-36.

P. ¿Y cómo, si de alguna manera, se han reportado las ventas de ese producto a través de los años en Puerto Rico?

R. Las ventas fueron incrementando a un nivel que en un momento Sazerac nos dice a nosotros, a través de Ken Chapman, "Lo que ustedes están haciendo en Puerto Rico no es lo que hacemos en Estados Unidos, porque nosotros vamos más tipo" – a lo que definen "guerilla" – a las barras. Lo que ustedes están haciendo está funcionando en Puerto Rico. Sazerac va a aprobar ir 50 y 50, con todos los gastos completos, incluyendo los billboards, festivales – todas las actividades que ustedes hagan, las vamos a poner dentro del mismo pote van a cualificar". Y era por la ejecutoria de nosotros y el crecimiento de ventas que estábamos teniendo con Fireball en Puerto Rico.[3]

El resto de la transcripción de la prueba oral, y documental presentada durante la vista del entredicho provisional comprueban preponderantemente el trabajo, esfuerzo y dedicación del personal de la parte recurrida en la creación de una demanda local para la bebida de *fireball whisky.* La parte recurrida continuó su actuación conforme a la prestación debida, y creó un espacio comercial para la nueva marca a tal punto que constituía uno de los productos de mayor demanda para el tipo de bebida. El testimonio del *customer business manager* de la *División de Licores* de la parte recurrida, el señor Alejandro Calancha Figueras coteja lo anterior:

P. En el 2014, cuando se introdujo este producto Fireball de cinnamon whisky al mercado de Puerto Rico, ¿puede usted describir cuál fue el mayor reto para cobrar tracción en el consumidor puertorriqueño?

R. Bueno, primero que nada, que la gente lo conociera, porque aquí nadie sabía qué era ese producto. ¿Sabes? Un producto que a lo mejor en los Estados Unidos la genta lo conocía, pero aquí no tenía ningún tipo de publicidad, ni la gente exterior - ¿sabes?, interiormente la genta en el exterior lo veía.

So que aquí fue llevar a la gente a ese paradigma de que "Me estoy dando un whisky con canela", ¿sabes? La gente no sabe lo que es eso, la gente, pues, piensa "un whisky, pero me lo bebo con agua, con coco, con diferente" – otro mixer. Pero el whisky con canela...

Y obviamente se hizo un trabajo bastante arduo en términos de representación y de llevarlo a que era el producto de la fiesta, del party. Y así logró llegar - ¿sabes?, la gente le empezó a coger el paladar al producto, ¿sabes?, y fuimos creciendo y fuimos pasándole a los otros productos que – lo que eran "shooters" en aquel momento, pues estamos hablando de Jägermeister o un tequila. O sea, son productos que acostumbran a pedir en shots.

---

[3] *Íd.*, págs. 36-38.

P. ¿y quién lideró ese esfuerzo de introducir el producto Fireball Cinnamon Whisky en el mercado de Puerto Rico?

R. Pan American. Nosotros, Pan American Properties, con el equipo de...

P. En ese proceso que usted ha descrito de introducir el producto a los clientes, que fueran adquiriendo ese paladar hacia un whisky de cinnnamon, ¿qué participación directa con el cliente tuvo Sazerac?

R. ¿Participación directa?

P. Sí.

R. Bueno, era la comunicación que tenía con nosotros, pero nosotros éramos los que estábamos en la calle.

P. Okey.

R. ¿Sabes? Y en un comienzo no había como que algo, ¿sabes?, no era una relación – no era una relación, sino prácticamente lo hacíamos nosotros. Luego de que ya la marca fue creciendo, fue que empezó a haber una participación de parte de Sazerac en términos de gastos en conjunto con Pan American Properties.

P. Y antes de que Sazerac participara en el gasto de promoción del producto en Puerto Rico, ¿quién incurría en el gasto de promoción?

R. Pan American Properties.

[...]

P. Y le pregunto: ¿aproximadamente en qué año fue que Sazerac comenzó a compartir o de alguna manera aportar en los gastos de promoción del producto Fireball en Puerto Rico?

R. Bueno, yo entiendo que la inclusión de Sazerac, cuando ya estábamos teniendo un volumen alto en términos de gasto, entiendo que fue alrededor del 2016, finales de 2016 puede ser.[4]

El señor Calancha Figueras continuó con su testimonio sobre el valor económico creado sobre la marca *Fireball* consecuencia del trabajo de mercadeo y promoción efectuado por la parte recurrida desde el año 2014 cuanto introdujo al mercado de Puerto Rico la bebida *Fireball Cinnamon Whisky*:

P. ¿Y qué tipo de inversiones publicitarias o promociones a través de todos estos años ha realizado Pan American Properties para promover la venta y distribución de ese producto Fireball en Puerto Rico?

R. Muchas. Estamos hablando desde auspicio de eventos, conciertos, eventos personalizados de la misma marca Fireball, happy hour, promotoras – obviamente apoyos de promotoras y empujes de venta en diferentes negocios,

---

[4] *Íd.*, págs. 776-778.

billboards, convenciones, todo lo que puede haber en términos de apoyo al mercado.[5]

El *customer business manager* también testificó sobre el esfuerzo efectuado para llevar el producto de *Fireball Cinnamon Whisky* a un nivel de ventas sobresaliente en el mercado local:

P. Okey. ¿Cuál es el SKU o el envase de producto Fireball de mayor crecimiento en venta en Puerto Rico en la actualidad?

R. En la actualidad, el 50 ml.

P. ¿Cuándo usted inició a trabajar o, como parte de sus funciones en Pan American Properties, comenzó a trabajar con el producto Fireball?

R. Desde el comienzo en el 2014.

P. ¿Cuál ha sido la tendencia en ventas de ese producto Fireball en Puerto Rico que distribuye Pan American Properties, desde que usted inició a trabajar con el producto?

R. Bueno, desde que nosotros - desde que – en el momento que yo inicié, era un producto que apenas mucha gente lo conocía. ¿Sabes?

Nosotros hicimos mucho trabajo – hablo "nosotros" incluyéndome a mí, ¿verdad?, porque también yo trabajaba en muchas actividades de eventos con el equipo de mercadeo y el equipo de promociones en aquel entonces.

Fuimos poco a poco llevándolo a muchas fiestas, trabajando muchos happy hours, haciendo mucha rotulación en la calle para que fuera creciendo.

Que en su – o sea mientras fue pasando el tiempo, 2014 a 2016, ya estamos hablando que un dos mil – entre el 2016 al 2019, era el producto de preferencia de shot en Puerto Rico, porque el producto es un whiskey, pero es lo que nosotros le llamamos un "shooter", que la gente lo que acostumbra es pedirlo también por shot.

Y en ese entonces, pues estamos hablando que ya Fireball era el líder y era el tercer whisky de mayor venta en todo Puerto Rico.

P. ¿En qué – en qué años fue eso?

R. Ya – estamos hablando como desde el 2019 al dos mil – 2019 al 2021; todavía – 2022 todavía seguía siendo el tercer whisky de mayor venta en Puerto Rico.

P. Y cuando usted dice "el tercer whisky de mayor venta en Puerto Rico, ¿a qué usted se refiere cuando describe la categoría de whisky?

R. Bueno, eso se ve por unas datas de mercado que trabajan unas compañías, en este caso IRI, que por – periódicamente ellos pasan una data que ellos van evaluando la venta en diferentes comercios, y ahí ellos le ponen lo que le llaman el "market share", que es el nivel de venta de cada producto en

---

[5] *Íd.*, pág. 779.

términos de cuál se vende más, cuál se vende menos en diferentes mercados.[6]

Pudimos verificar en la prueba una tendencia positiva en ventas en el producto hasta la introducción del *Fireball Cinnamon Malt Beverage 50 ml* en el mercado de bebidas en Puerto Rico. El testimonio del vicepresidente ejecutivo muestra la consecuencia sobre las ventas de *Fireball Cinnamon Whisky* de la entrada del *Fireball Cinnamon Malt Beverage 50 ml* al mercado:

> P. Okey. ¿Qué si algo, ha sido – cuáles han sido los hallazgos de – sobre lo que ha ocurrido en el mercado, referente a ese producto de Fireball de malta?
>
> R. Que ya eso nos está afectando en las – en la venta. Hay clientes de nosotros que están dejando de comprarnos, y el producto de nosotros no está rotando como – como rotaba antes de que se lanzara el producto en versión de malta.
>
> P. Okey. ¿Tiene usted conocimiento personal de cómo se está vendiendo este producto con base en malta en las gasolineras y – y down the trade?
>
> R. Bueno, fui a echar gasolina, casualmente, la semana – el jueves o viernes de la semana pasada, en la gasolinera de – de San Patricio, y cuando entré, están los dos productos, uno al lado del otro, detrás de la caja registradora –
>
> P. ¿y en qué envase se está vendiendo este producto?
>
> R. 50 ml.
>
> P. ¿El de malta?
>
> R. El de malta.
>
> P. Okey. Le pregunto si usted tiene conocimiento de – cómo, si de alguna manera, se han afectado las ventas del producto Fireball de whiskey a raíz de esa introducción de ese producto de malta en las últimas dos semanas.
>
> R. El gerente – el vicepresidente de ventas ha visto una – una merma en las ventas de los – de los clientes también.[7]

Es significativo destacar que, desde un principio la parte peticionaria tenía previsto distribuir la nueva bebida de malta mediante la parte recurrida. Durante varios años, las partes negociaron sobre el asunto. La parte recurrida completó varios trámites gubernamentales para introducir el producto en Puerto Rico. Las partes preliminarmente acordaron precio, un plan de

---

[6] *Íd.*, págs. 773-775.
[7] *Íd.*, págs. 329-330.

venta, y la forma de mercadear el nuevo producto. Inclusive, a mediados del 2024 la parte recurrida hizo la primera orden para el *Fireball Cinnamon Malt Beverage*. Según el testimonio del vicepresidente ejecutivo, el señor Fernández González existía un plan mediante el cual *Fireball Cinnamon Malt Beverage 50 ml* reemplazaría a su contraparte el *Fireball Cinnamon Whisky 50 ml* en Puerto Rico:

> R. Cuando nosotros estábamos planificando la estrategia con – de la mano con Sazerac, había [indiscernible] un phase-in del producto de malta y un phase-out del producto de whiskey – del 50 ml. Pero al final, era un bolsillo nuestro a otro bolsillo nuestro. Inclusive, se habló de transicionar [sic] al formato de 200 ml también –
>
> P. ¿Transicionar [sic] qué producto al formato de 200 ml?
>
> R. El Fireball. Primero se iba a lanzar el de 50 ml, y posteriormente se iba a introducir el de 200 ml a base de – con base de malta también.[8]

Pero justo en esa fase comenzó la dificultad entre Sazerac y Pan American Properties. Sazerac no honró la primera orden de la parte recurrida para comenzar la venta de la nueva bebida en Puerto Rico. De repente la línea de crédito de la parte recurrida era insuficiente para honrar las órdenes de compra. La situación continuó durante meses hasta que, en abril de 2024, Sazerac notificó por escrito a la parte recurrida su decisión de distribuir el nuevo producto por vía de otra compañía de distribución. La data sobre ventas recopilada por la parte recurrida en aquel periodo muestra una disminución en ventas del producto *Fireball Cinnamon Whisky* correlativo a la introducción del producto *Fireball Cinnamon Malt Beverage 50 ml* en los puntos de ventas utilizados por Pan American Properties. El vicepresidente de ventas de la parte recurrida, el señor Luis Eduardo Albandoz Acevedo, testificó sobre estos extremos:

> P. En cuanto al producto del Fireball Cinnamon Whiskey en su formato de 50 ml, en el año 2023 – ya sea de enero a diciembre de 2023, ¿cuál ha sido la tendencia de ventas de

---

[8] *Íd.*, págs. 333-334, 336.

ese producto? ¿o cuál fue la tendencia de ventas de ese producto?

R. Bueno, la tendencia de venta de Fireball 50 ml siempre ha sido crecimiento. Sin embargo, en los últimos 2 meses, si vemos la venta de marzo y abril y lo comparamos contra marzo y abril del año anterior, vemos una disminución de 230 clientes menos, que esto es una disminución del 26.5 por ciento.

P. Okey. Pero en el año 2023, ¿cuál era la tendencia de ese formato en cuanto a ventas?

R. Crecimiento.

P. Okey.

R. Sí.

P. ¿Cómo le consta esa información?

R. Porque nosotros tenemos data de venta, POS [purchase on spot], de cada uno de los clientes.

P. ¿Cómo, si de alguna manera, usted recopila esa data de venta?

R. Yo recopilo esa data básicamente de la facturación que se hace en cada uno de los clientes.

[…]

P. ¿Qué es este documento?

R. Este documento es la venta histórica de Fireball 50 ml 2022 versus 2023.

P. Okey. ¿Quién preparó este documento?

R. Yo lo – yo lo preparé.

P. ¿Qué formato de productos están representados en esta data?

R. Únicamente y exclusivamente el 50 ml.

P. ¿Y de dónde usted obtuvo la data para preparar esta tabla?

R. De la venta histórica de los clientes, que aparece a nivel de facturación?

P. ¿Y qué formato de productos están representados en esta tabla?

R. Única y exclusivamente el 50 ml, en el formato 10-pack?

[…]

P. Testigo, yendo al contenido de este documento, ¿pudiese usted explicarle al Tribunal lo que usted mencionó ahorita sobre la tendencia en las ventas de este producto en el formato 50 ml en el año 2023?

R. Bueno, año 2023 vemos un crecimiento sostenido de básicamente, en el mes de enero, un 102 por ciento, en febrero un 46, en marzo un 87, en abril un 255 – y en todos los meses se veía un alza. Sin embargo, en el mes de julio hubo una disminución en las ventas de 1.99 por ciento. Y

cuando vemos el total y lo comparamos el año anterior, vemos un crecimiento de 45.21 por ciento.

P. Okey. Explíquele al Tribunal, en cuanto a los porcientos, ¿qué es lo que está usted comparando en esta tabla?

R. Yo estoy comparando el mismo mes en el año anterior.

P. Okey. ¿Y de qué años?

R. 2022 versus 2023.

P. Okey. Entonces, ¿cuántos – cuántas 10-packs de este producto de 50 ml se vendieron en total en el año 2022, según esta tabla?

R. 2022 estamos hablando que fue 10,085.

P. Okey. ¿Y en el año 2023?

R. 14,644.

P. ¿Y cuál fue el porciento de crecimiento en esas ventas?

R. 45.21.

P. Okey. Oiga, y le pregunto, la parte inferior de esta tabla, de este documento que usted preparó, ¿puede usted explicar qué es lo que usted hizo en esa tabla?

R. La parte inferior estamos comparando lo que es 2022 versus 2023 de los meses de enero a mayo.

P. ¿Y cuántas unidades de este 10-pack habían vendido en los primeros cinco meses del año 2023?

R. En los primeros meses: en el 2023, 6,100, y en el 2024, 5,635.

P. ¿Y cuál ha sido la tendencia en comparación de las ventas mensuales de 2023 y 2024 de enero a mayo?

R. Vemos una disminución en venta. Básicamente, en enero, de 1.72 por ciento; en febrero, de 5.83 por ciento; en marzo, de 13.27; abril, 5.43 negativo, y mayo, 9.02 por ciento negativo.[9]

El vicepresidente de ventas continuó su explicación del deterioro en ventas del producto *Fireball Cinnamon Whisky* por la entrada al mercado del *Fireball Cinnamon Malt Beverage 50 ml*:

P. Okey. Señor Albandoz, ¿qué conocimiento, si alguno, tiene usted sobre el producto de Fireball Cinnamon Malt en Puerto Rico – y su venta en Puerto Rico?

R. ¿Conocimiento de la venta?

P. No, ¿qué conocimiento tiene usted sobre ese producto?

R. Bueno, ese producto entró al mercado en abril de este año y es un producto que tiene 16.5 por ciento de alcohol versus el Fireball Whisky, que tiene un 33.

---

[9] *Íd.*, págs. 686-693.

P. Oiga, ¿y quién está distribuyendo ese producto en Puerto Rico?

R. CC1.

P. Okey. Oiga, usted dice que ese producto inició en abril de 2024.

R. Correcto.

P. La tabla que usted preparó refleja una reducción en ventas desde enero de 2024. ¿Puede usted explicarle al Tribunal por qué – a qué usted le atribuye esa – esa reducción desde enero?

R. Bueno, esa disminución desde enero nosotros la estamos viendo – se ha comportado de esa manera porque la categoría ya, en lo que es 50 ml, está bastante madura por el tiempo que lleva. Y este año estaba básicamente flat al principio. Sin embargo, en los últimos dos meses, que es abril y mayo, ahí vemos una disminución en venta más allá de lo que ponen estos números; cuando lo comparamos los 841 clientes que compraron en ese periodo de tiempo, una disminución de 231 clientes en la data. Que esto significa que hay una disminución de 26.5 por ciento a nivel de la base de clientes de Fireball 50 ml Whisky.

[...]

P. Explíqueme nuevamente. O sea, ¿qué – cuál es la tendencia que usted ha visto en términos de clientes?

R. ¿De clientes?

P. Sí.

R. Un 26.5 por ciento menos clientes comprando, comparándolo con el año anterior en el mismo periodo.

P. O sea, que ustedes tienen 26.5 por ciento de sus clientes existentes están comprando menos el producto este año 2024.

R. Correcto.

P. Okey. ¿Y qué usted le atribuye esa reducción?

R. Yo le atribuyo al producto que tiene CC1 al día de hoy, malt-base.[10]

El menoscabo del mercado creado y la clientela conquistada por un distribuidor constituye fundamento suficiente para la procedencia del interdicto codificado en la Ley Núm. 75-1964. La Ley Núm. 75-1964, busca suprimir la indeseable práctica por parte del principal de contribuir al deterioro de la plusvalía del distribuidor una vez este logró crear un mercado favorable para el producto o servicio que distribuye, en virtud del contrato de distribución con el

---

[10] *Íd.*, págs. 686-693.

principal. Conforme verificado en el testimonio y prueba ofrecida por la parte recurrida la introducción del *Fireball Cinnamon Malt Beverage 50 ml* al tráfico del comercio local erosionó el mercado obtenido y desarrollado por la parte recurrida para el producto *Fireball Cinnamon Whisky*. Desde la introducción de la nueva bebida, la tendencia en ventas y clientes del *Fireball Cinnamon Whisky* comenzó a decaer en números de tal consideración que motivaron la presentación de la causa de acción del epígrafe.

En resumen, la parte recurrida logró demostrar que: (1) está cobijada bajo la figura del distribuidor (el derecho de exclusividad a favor de la parte recurrida para distribuir el producto *Fireball Cinnamon Whisky*); (2) la parte peticionaria menoscabó la plusvalía del producto *Fireball Cinnamon Whisky*.

Antes de concluir, es importante añadir en este punto las propias admisiones de la parte peticionaria en cuanto a la introducción al mercado de Puerto Rico del nuevo producto *Fireball Cinnamon Malt Beverage 50 ml.* Primero, el director comercial de Centro América y el Caribe de Sazerac admitió que, el producto *Fireball Cinnamon Malt Beverage 50 ml* fue diseñado para competir con la bebida *Fireball Cinnamon Whisky*:

> P. Que el Fireball de malta y el Fireball de whiskey se venden en los mismos lugares. ¿Correcto?
>
> R. No hay restricción.
>
> P. No hay restricción, así que se venden una al lado del otro en las gasolineras.
>
> R. Podrán venderse, sí.
>
> P. Y se venden uno al lado de otro en los liquor stores. ¿Correcto?
>
> R. Sí.
>
> En específico, la parte peticionaria argumenta que la introducción del nuevo producto al mercado local no menoscabó la plusvalía creada por la parte recurrida para el *Fireball Cinnamon Whisky* en Puerto Rico.
>
> [...]

P. Sin embargo, a pesar de eso, es su testimonio que el Firewall de malta no compite con el Fireball de whisky. ¿Eso es correcto?

R. ¿El Fireball de malta no compite? Yo – mi testimonio es que son productos distintos.

P. La pregunta es si compiten o no compiten con – para el mismo consumidor.

R. Sí. Podría – en ocasiones distintas podría, sí.[11]

Inclusive, el testigo admitió que, la nueva bebida fue creada con el propósito de proveer una experiencia similar al *Fireball Cinnamon Whisky*. También admitió la pertenencia del producto *Fireball Cinnamon Malt Beverage 50 ml* bajo la familia de productos de bebidas categorizados bajo la marca "Fireball":

P. Dígame, testigo: viendo el Exhibit 1, que es el que se llama "Fireball Cinnamon Whisky", le pregunto si la etiqueta identifica el producto en la parte superior como "Fireball".

R. Correcto.

P. Y tiene un demonio rojo.

R. Sí.

P. Y dice las palabras "Red Hot".

R. Sí.

P. Y el de malta en la parte superior dice "Fireball". ¿Correcto?

R. Correcto. Sí.

P. Y tiene un demonio rojo.

R. Sí.

P. Y dice "Red Hot".

R. Sí.

P. Okey. Y los 2 productos tienen un sabor a cinnamon, a canela.

R. Sí.

P. Okey. Y el de – Fireball Cinnamon está hecho para que tenga ante el consumidor el mismo sabor similar al producto de whisky. ¿Correcto?

R. Correcto.

P. Que el efecto es que el consumidor que no va al liquor store en Estados Unidos pueda tomarse un shot del Fireball Cinnamon y tener la misma experiencia que con el Fireball Cinnamon Whisky. ¿Correcto?

---

[11] *Íd.*, págs. 1034-1036.

[…]

P. En efecto, es que el Fireball Cinnamon se vende – se produce para que el consumidor, cuando se toma un shot, pueda sentir el mismo – el mismo sabor y la misma experiencia que cuando bebe el Fireball Cinnamon Whisky. ¿Correcto?

R. Sí. Correcto, sí.

P. Una experiencia similar.

R. Correcto.

P. ¿Sí?

R. Correcto.

P. Y usted que conoce el mercado de Puerto Rico, desde que trabaja en Diageo, sabe que aquí en todo momento el consumidor conoce estos productos como el producto Fireball. ¿Correcto?

R. "Estos productos", ¿te refieres a los de 50 ml, al –

P. Al producto Fireball Whisky – Cinnamon Whisky, lo conoce como "Fireball". ¿Correcto?

R. Sí.

P. Y el producto Fireball Cinnamon lo conoce como "Fireball" también. ¿Correcto?

R. Ahora que lo está conociendo sí.

[…]

P. Oiga, y usted habló de una persona que es una worldwide brand manager de Fireball. ¿Correcto? En Sazerac.

[…]

P. Christina Donovan.

R. Donovan.

P. Ella es una Fireball brand manager worldwide para Sazerac. ¿Correcto?

R. Global.

P. Global. Muy bien. Y ella es la brand manager global de la marca Fireball. ¿Correcto?

R. Era. Correcto.

P. En su momento lo fue.

R. Sí.

P. Y la – y manejaba tanto el Fireball de malta como el Fireball de whisky. ¿Correcto?

R. Sí.

P. Porque Sazerac trata la marca Fireball como una sola marca. ¿Correcto?

R. ¿Marca Fireball? Sí.

P. Y de hecho, usted tiene conocimiento que la marca que tiene registrada Sazerac es Fireball. ¿Correcto?

R. Sí.[12]

El ejecutivo reconoció además que, el *Fireball Cinnamon Malt Beverage 50 ml* es una amenaza al *Fireball Cinnamon Whisky*:

P. Y una de las amenazas del producto de Fireball Cinnamon Whisky son precisamente los productos con base a malta. ¿Correcto?

[…]

P. Amenaza en el crecimiento y desarrollo del producto de Fireball Whisky es la introducción de los productos con base en malta. ¿Correcto?

R. Amenaza al Fireball Whisky son los productos de malta en Estados Unidos. ¿Esa es la pregunta?

P. En Puerto Rico y en Estados Unidos, sí. ¿Usted sabe lo que es un SWOT análisis?

R. Sí, en español.

P. ¿Qué es un SWOT análisis?

R. FODA.

P. ¿Y qué significa eso?

R. Son cuatro cuadrantes. Esto es algo que [Indiscernible]. Pero son cuatro cuadrantes donde se analizan las fortalezas, las amenazas, tanto del producto como de la industria.

P. Se identifican las fortalezas del producto, las debilidades del producto, las amenazas del producto y las oportunidades del producto. ¿Correcto?

R. Sí. Correcto.

[…]

P. La página 3 de este exhibit – página 3, dígame si es o no es cierto que con el logo de Sazerac, y se titula "Annual planning template Sazerac bran plan, Puerto Rico, Fireball, Pan American Grain, financial period fiscal year ´22. ¿Correcto?

R. Correcto.

P. Y en las – 2 páginas más adelante se presenta un SWOT análisis.

R. Correcto.

P. Y ese SWOT análisis en el cuadrante de amenazas, ¿el número 4 qué dice?

R. "[indiscernible] individualistic consumption threats" –

---

[12] *Íd.*, págs. 1037-1042.

P. No. El cuadrante número 4 inferior del lado derecho.

R. "Threats"

P. "Threats".

R. Estoy leyendo.

P. Amenazas.

R. Eso estoy leyendo.

P. El número 4.

R. "Malt-based products".

P. Esto está identificado, los productos de malta, como una amenaza al producto de whisky. ¿Correcto?

R. Correcto.

P. ¿Eso le refresca entonces la memoria sobre lo que usted no recordaba hace unos minutos?

R. Es que esto es antes de que yo comenzara a trabajar acá.

P. Claro, pero usted lo compartió y se compartió con usted en enero de 2022, con el equipo de Pan American Properties. ¿Correcto?

R. ¿El equipo? Elmar lo envía aquí. Sí.

P. Claro.

R. Correcto.

[…]

P. Dígame si es o no es cierto que, para septiembre de 2021, según este Exhibit 2, Sazerac, a través de Ken Chapman, le notifica a Pan American Properties que todo el formato de 50 ml en Puerto Rico va a cambiar al producto con base en malta.

R. Eso es correcto.

P. Okey. Y que la expectativa era vender 50,000 cajas de ese producto al año.

R. Correcto.[13]

En cuanto a las referidas admisiones, citamos con aprobación, e incorporamos a esta sentencia la conclusión de derecho efectuada por el tribunal recurrido sobre el asunto:

> Por otra parte, la prueba presentada estableció la existencia de una estrategia intencional de SCI de: 1) aprovechar el mercado creado para el producto de whisky por Pan American como base de lanzamiento del nuevo producto; y 2) de mantener la confusión entre ambos productos para incrementar las ventas del nuevo producto de menor precio. Ello constituye por sí mismo un menoscabo de la relación contractual entre Pan American y SCI, independientemente

---

[13] *Íd.*, págs. 1044-1045, 1047-1050.

de la ocurrencia o no de la mencionada reducción en las ventas. Esta situación es precisamente la que la Ley 75 pretende evitar, conforme a su exposición de motivos.

[...]

[E]n este pleito está envuelto directamente un acto de menoscabo de la relación establecida entre SCI como principal o concedente y Pan American como distribuidor, del producto Fireball Cinnamon Whisky. Dicho acto de menoscabo consiste concretamente en la introducción al mercado y el comienzo de la distribución en Puerto Rico del producto Fireball Cinnamon Malt Beverage a través de un distribuidor distinto a Pan American (entiéndase CC1), con una presentación sustancialmente igual a la presentación de 50ml del Fireball Cinnamon Whisky, en los mismos puntos de venta, a un precio menor y con un mercadeo montado o apoyado sobre el mercadeo desarrollado por Pan American para la distribución de su producto de whisky.

Sentado el menoscabo en el caso, el peticionario debió presentar prueba sobre el detrimento que, sobrevendrá a sus propios negocios, productos, o servicios, de obligarlo a mantener la prohibición de ventas *pendente lite*. Pudimos corroborar en la prueba que, el impacto sobre las ventas anuales de CC1 no es significativo, sus ventas totales para el año 2023 fueron de 700 millones de dólares. La venta anual proyectada de $3,900,000 del producto *Fireball Cinnamon Malt Beverage 50 ml* representa 1% de la venta anual de CC1. En consecuencia, la prohibición de venta pendiente el pleito afectaría mínimamente el negocio de las corporaciones que componen la parte peticionaria.

Expuestas las respectivas posiciones, correspondía al tribunal apelado balancear los intereses de las partes en armonía con la política pública perseguida por la Ley Núm. 75-1964. *Next Step Medical v. Biomet, Inc., supra*, pág. 755. Según reflejado en la exposición de motivos de la Ley Núm. 75-1964, la Legislatura entendió que, por su trascendencia en el bienestar económico local, es necesario actuar para detener ciertas prácticas arbitrarias en detrimento de empresas locales. *Next Step Medical v. Biomet, Inc.*, supra, pág. 748.

En este caso quedó demostrada una de las prácticas abusivas que la ley aborrece. Un principal que, menoscaba la relación

contractual con uno de sus distribuidores, tan pronto el distribuidor creó un mercado favorable para uno de sus productos. La Ley Núm. 75-1964 fue creada precisamente para impedir a un principal apropiarse o aprovechar injustamente la plusvalía de un negocio después de que un distribuidor local conquistó el mercado local y desarrolló una clientela a través de su gestión empresarial. *Next Step Medical v. Bromedicon*, *supra*, pág. 489. La prueba corroboró el esfuerzo comercial efectuado por la parte recurrida para abrir el mercado local al producto de *whisky* de la parte peticionaria. La gestión abarcó varios años de promoción, entrega de mercancía, mantenimiento del inventario local para allegar el nuevo producto al consumidor. Según la prueba, la labor de la parte recurrida fue tan exitosa, en términos de ventas y reconocimiento social que, el propio peticionario aceptó la eficacia de la estrategia y decidió contribuir como igual. Ahora después de una década de trabajo a favor de la empresa en común concebida entre las partes, esta es afectada y amenazada por un producto nuevo diseñado por la propia peticionaria con el propósito de desplazar del mercado local el producto distribuido por el recurrido.

La Ley Núm. 75-1964 describe el tipo de menoscabo efectuado por la parte peticionaria:

> A los efectos de este capítulo, y particularmente a los efectos de la sec. 278a de este título:
>
> (a) ….
>
> (b) Se presumirá, salvo prueba en contrario, que un principal o concedente ha *menoscabado* la relación establecida en cualquiera de los siguientes casos:
>
>> (1) Cuando el principal o concedente establece en Puerto Rico instalaciones para la distribución directa de mercancía o la prestación de servicios que previamente han estado a cargo del distribuidor, o que se relacionen con la mercancía o la prestación de servicio a cargo del distribuidor al ser de la misma marca comercial o cualquier otra del mismo principal o concedente, o que el distribuidor haya solicitado previamente tener a su cargo.
>>
>> (2) …

(3) ...

(4) ...

(c) ...

Art. 2A, Ley Núm. 75-1964, 10 LPRA § 278a-1.

En cuanto al balance de intereses, el Tribunal Supremo expresó que "[s]on los intereses de las partes y la protección de la política pública que informa el estatuto los que rigen su uso". *Next Step Medical v. Biomet, Inc., supra,* pág. 754. La parte recurrida menoscabó la plusvalía creada por la parte peticionaria. Sazerac y CC1 pretenden aprovecharse de la clientela desarrollada y establecida por la parte recurrida para el producto *Fireball Cinnamon Whisky* para distribuir el producto *Fireball Cinnamon Malt Beverage.* Pudimos corroborar el impacto mínimo del interdicto sobre los negocios de Sazerac y CC1. Esto en contraposición a la protección de la plusvalía creada por la parte recurrida, pieza principal en la política pública establecida en la Ley Núm. 75-1964 y sobre la cual el legislador estableció un mandato de protección especial sobre cualquier otro interés involucrado en el contexto del negocio de distribución y ventas de productos foráneos en nuestra jurisdicción. Ello, con el fin de lograr una razonable estabilidad en las relaciones de distribución en Puerto Rico y erradicar ciertas prácticas que, más allá de contribuir a la estabilidad económica, inciden sobre las expectativas legítimas que las partes vinculadas en un negocio ostentan respectivamente. *Next Step Medical v. Bromedicon, supra,* pág. 488.

Examinada las posturas de las partes, corroborados los elementos fácticos necesarios en la prueba testimonial y documental para la expedición del remedio solicitado, el balance de equidades está inclinado a favor de la parte recurrida. Expedir el entredicho solicitado promueve la política pública esgrimida en el estatuto, protege el mercado local de las actuaciones arbitrarias efectuadas

por principal en menoscabo de una relación contractual *bona fide* con uno de sus distribuidores sin otra razón que su propio deseo.

Debemos resaltar en este punto que, la relación principal-distribuidor se caracteriza por la cooperación, la estabilidad y la confianza mutua. *Roberco, Inc. y Robert Colón v. Oxford Industries, Inc.*, 122 DPR 115, 131 (1988). La finalidad de esta relación es crear, desarrollar y obtener nueva clientela. *Íd.* No es posible al principal imponer sus condiciones a la política de venta del distribuidor o viceversa, con la correspondiente pérdida de la autonomía económica y jurídica de ambos. *Medina & Medina v. Country Pride Foods*, 122 DPR 172, 190 (1941).

### *-IV-*

Por los fundamentos antes expuestos, los que hacemos formar parte de este dictamen, *expedimos* el auto de *certiorari* solicitado, *confirmamos* la *Resolución y Orden* recurrida, y *dejamos* sin efecto nuestra *Resolución* del 7 de febrero de 2025 para que la orden de entredicho provisional emitida por el tribunal surta todo su efecto mientras culmina el pleito.

Por último, al amparo de la autoridad que nos confiere la Regla 35(A)(1) de nuestro Reglamento, 4 LPRA Ap. XXII-B, R.35(A)(1),[14] el Tribunal de Primera Instancia no tendrá que esperar por la remisión del mandato para continuar con el trámite del caso de referencia.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[14] En lo pertinente, la citada regla dispone que la "expedición del auto de certiorari suspenderá los procedimientos en el Tribunal de Primera Instancia, **salvo que el Tribunal de Apelaciones disponga lo contrario**" (énfasis suplido).